# W ILBUR F. S TOREY

*v.*

# T HE P EOPLE OF THE S TATE OF I LLINOIS.

1. C ONTEMPT OF COURT —*power of court to punish.* There is now no statute in force in this State, authorizing courts to punish offenders for contempt, except in regard to the enforcement of decrees in chancery, and the punishment of certain specified offenses, such as the failure of jurors to attend in obedience to summons, the failure of officers to make service and return of writs, etc.

2. Courts, however, possess certain common law powers, subject to modifications that may have been imposed by the constitution and stat- utes, among which is included that of punishing for contempt.

3. S AME —*libelous publications, whether punishable.* It is not admissible, under our constitution, that a publication, however libelous, not directly calculated to hinder, obstruct or delay courts in the exercise of their proper functions, shall be treated and punished, summarily, as a contempt of court.

4. The publication of a libel on a grand jury, or on any member there- of, in relation to any act already done by them in their official capacity, but which has no tendency directly to impede, embarrass or obstruct the grand jury in the discharge of any of its duties remaining to be performed after the publication is made, can not be summarily punished as a con- tempt of court.

5. C ONSTITUTIONAL GUARANTY —*of freedom of speech, applies to judicial conduct and character.* The constitutional provision, "that every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and crimi- nal, the truth, when published with good motives and justifiable ends, shall be a sufficient defense," applies to words spoken or published in regard to judicial conduct and character.

W RIT OF E RROR to the Criminal Court of Cook county; the Hon. E RASTUS S. W ILLIAMS, Judge, presiding.

This was a proceeding, in the name of the People, in the criminal court of Cook county, against Wilbur F. Storey, for contempt of court, in the publication of certain articles in "The Chicago Times," reflecting upon the action of the grand jury in finding indictments against him in said court.     The

court below found the defendant guilty, and sentenced him to imprisonment in the county jail. The defendant brings the case here by writ of error.

Messrs. GOUDY & CHANDLER, for the plaintiff in error.

Mr. CHARLES H. REED, State's Attorney, for the People.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The several articles copied into the information, censure the action of the grand jury, and question its integrity. as a body, and one of them indirectly attacks the moral character of certain of the members of the grand jury. The information charges that these articles were published while the grand jury was in session, and, also, that respondent was charged with certain crimes and offenses, which were heard by the grand jury; but it is not alleged that the crimes and offenses so charged were pending before the grand jury for its action, at or subsequent to the time of the publication of the articles, or either of them. On the contrary, it is alleged that the articles were "of and concerning the grand jury, and the individual members thereof," and of and concerning its action with reference to the complaint against the respondent, and "of and concerning its action with reference to other complaints presented to it"—all being in the past. And the respondent answers, to one of the interrogatories propounded to him, "that on the 13th day of March, 1875. and before any of said articles were so published, the grand jury  *  *  returned into said court three indictments against him for libel, and one for publishing an obscene newspaper, and said indictments were the only matters referred to in said articles, or any of them. And he further says, upon information and belief, that, at the time said articles were written and published, there were no complaints against him pending before said grand jury, of any kind whatever, and he did not suspect

that any other or further indictments would be returned against him by said grand jury, and he denies that said articles, or any of them, or any part thereof, referred to any complaints or charges then pending against him before said grand jury."

There is no allegation that the publication of the articles is calculated to prevent the obtaining of a competent petit jury to try the respondent on the several indictments, or that the judge, whose duty it will be to preside during such trials, will, in anywise, be affected thereby in the discharge of his duty.

The only question, therefore, is, assuming the articles to be libelous, whether the publishing of a libel on a grand jury, or on any of the members thereof, because of an act already done, may be summarily punished as a contempt.

We do not understand the articles as having a tendency directly to impede, embarrass or obstruct the grand jury in the discharge of any of its duties remaining to be discharged after the publications were made. No allusion is made to any matter upon which the members were thereafter to act, and there could, therefore, of necessity, be no attempt to interfere with the exercise of their free and unbiased judgments as to such matters. No attempt is made to induce disobedience in officers or witnesses, and it does not appear that any direct interference with the administration of the law was in contemplation. All that it would seem could be claimed is, that the publications would cause disrespect to be entertained by the public for the grand jury, and for its action in the particular cases criticised, and thereby tend, to that extent, to bring odium upon the administration of the law. That this is a grave offense, deserving of prompt and severe punishment, might be conceded, without, in the slightest degree, strengthening the position that it may be treated and punished as a contempt of court. The law, presumably, provides an adequate punishment and mode of procedure to protect society against all offenses, and neither the magnitude of a

crime, nor the probability of its frequent repetition, has ever been held to authorize the courts to depart from the mode of trial prescribed by the law, or to impose a different punishment from that which it sanctions.

It is not denied by the counsel for the respondent, that courts may punish, as for contempt, those who do any act directly tending to impede, embarrass or obstruct the administration of the law; but they deny that any publication, however disrespectful, when applied to jurymen in regard to the manner in which they have already discharged a duty, does or is calculated to impede, embarrass or obstruct the administration of the law.

Authority may be found in the text books, and in English and American cases, holding a doctrine at variance with this position. Thus, for instance, Blackstone says, in showing how contempts of court may be committed, it may be "by speaking or writing contemptuously of the court or judges, acting in their judicial capacity; by printing false accounts (or even true ones, without proper permission.) of causes then depending in judgment; and by anything, in short, that demonstrates a gross want of that regard and respect which, when courts of justice are deprived of their authority (so necessary for the good order of the kingdom), is entirely lost among the people." But the law in relation to contempts has never been held, in any case decided by this court, to be so indefinitely broad as it is thus stated by Blackstone. Our constitution and statutes certainly affect the question, to some extent, and it is only in determining precisely how far they do so, that we have any difficulty.

A statute of this State, in force for many years, provided that the circuit and supreme courts should have power to punish contempts offered by any person to them while sitting, and for disobeying any of their process, rules and orders issued or made conformably to law. And the court held, in *Stewart* v. *The People*, 3 Scam. 402, that this statute might be regarded as a limitation upon the power of courts to punish for any

other contempts ; and newspaper articles. commenting upon the conduct of a juror who was also the editor of a rival political paper to that in which the articles were published, and reflecting contemptuously upon the judge, published during the pendency of a trial for murder, were held not to authorize an attachment for contempt.

It was said, in that case, in speaking of the power to punish as for contempt, in case of mere libels upon the court, having no direct tendency to interfere with the administration of the law : "It does not seem necessary, for the protection of courts in the exercise of their legitimate powers, that this one, so liable to abuse, should also be conceded to them.   It may be so frequently exercised as to destroy that moral influence which is their best possession, until, finally, the administration of justice is brought into disrepute.   Respect to courts can not be compelled ; it is the voluntary tribute of the public to worth, virtue and intelligence, and whilst they are found upon the judgment seat, so long, and no longer, will they retain the public confidence.   If a judge be libeled by the public press, he and his assailant should be placed on equal grounds, and their common arbiter should be a jury of the country ; and if he has received an injury, ample remuneration will be made."

In the more recent case of *The People* v. *Wilson,* 64 Ill. 195, a majority of the court held that the publication of an article, indirectly charging that money had been used to procure a decision favorable to the defendant in a case pending before this court on a writ of error, was a contempt, and the court accordingly imposed fines upon the editor and publisher of the newspaper in which the offensive article was published. Authorities were referred to in support of the positions assumed by one or more of the members of the court in that case, and a train of reasoning pursued, in the separate opinions delivered, from which the court below may have inferred, and probably did infer, assuming the law had not since then been materially changed in this respect, that any libel upon

4—79TH ILL.

the court or jury, whether tending directly to interfere with the administration of the law or not, might be punished as a contempt. But the decision turned upon the point, as will be seen by reference to the opinion of the Chief Justice, that the cause in reference to which the article was published was *then pending* before the court, undecided, and that the article was *calculated* to, and was *designed* to influence the members of the court in deciding it.

Had the law, therefore, as then in force, remained unchanged, it would be difficult to sustain the conviction of the respondent. But, since the decision of that case, the statutes have been revised, and the provision in regard to contempts, before quoted, has been repealed, leaving no statute in force on that subject, except in regard to the enforcement of decrees in chancery, and the punishment of certain specific offenses, such as the failure of jurors to attend in obedience to summons, the failure of officers to make service and return of writs, etc.

Courts, however, possess certain common law powers, subject to modifications that may have been imposed by our constitution and statutes, among which is included that of punishing for contempts.

Differences of opinion have been entertained by members of this court, at different times, in regard to the extent of such modifications; and we feel constrained, in giving expression to our views in the present case, to disagree, to some extent, with remarks made by some of the members composing the majority of the court in *Wilson's case, supra.*

In our opinion, it is not admissible, under our constitution, that a publication, however libelous, not directly calculated. to hinder, obstruct or delay courts in the exercise of their proper functions, shall be treated and punished, summarily, as a contempt of court.

Libels on courts of superior jurisdiction were, at common law, held to be contempts; but this did not apply to courts of inferior jurisdiction. If the power were necessary to the

existence and usefulness of the court, obviously, the difference in the jurisdiction could make no material difference, since it is quite as important that justice shall be fearlessly and impartially administered in courts of inferior as in those of superior jurisdiction.   But the power to punish for the constructive contempt in the court of superior jurisdiction, originated in a fiction, and was for a purpose that has no analogy in our government.

In a recent case, *The Queen* v. *Lefroy,* 8 Queen's Bench, 134, (4 Moak, 250.) the respondent was arrested on an attachment for contempt, for writing a letter, which was published in a local newspaper, charging the judge of a county court with falsehood.   COCKBURN, C. J., in delivering the opinion of the court, among other things, said :  "The power to commit for contempt is fully gone into by Blackstone and Hawkins; but though this power is recognized in the superior courts, it is nowhere said that an inferior court of record has any power to proceed for contempt out of court—and this is an obvious distinction between the superior and other courts of record.   In the case of the superior courts at Westminster, which represent the one superior court of the land, this power was coeval with their original constitution, and has always been exercised by them.   These courts were originally carved out of the one supreme court, and are all divisions of the *aula regis,* where it is said the king, in person, dispensed justice, and their power of committing for contempt was an emanation of the royal authority, for any contempt of the court would be a contempt of the sovereign.   But it is a very different matter with respect to the county courts, and similar inferior courts of record.   No case can be found in which such a power has ever been exercised by an inferior court of record, or, at all events, upheld by the decision of the superior court."

The theory of government requiring royalty to be invested with an imaginary perfection, which forbids question or discussion, is diametrically opposed to our theory of popular

government, in which the utmost latitude and freedom in the discussion of business affecting the public and the conduct of those who fill positions of public trust, that is consistent with truth and decency, is not only allowable but essential to the public welfare.

The common law mode of proceeding in cases of contempt, presents no question of fact to be tried by a jury. The defendant determines, by his own answer, under oath, whether he is guilty of that which is charged against him as a contempt of court, and if he fail thereby to purge himself, the court may, at once, impose the punishment.

The law of libel, at common law, left the jury to determine whether the defendant was guilty of the publication, alone; but the question of whether the publication was libelous was for the court; and it was not admissible to show, by evidence, that the publication was true; or the motives with which the publication was made. Whether, therefore, the party charged with the libel was tried by a jury or proceeded against summarily as for contempt, the only question of fact was, whether he was guilty of the publication.

In this State, however, our constitution guarantees "that every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty ; and in all trials for libel, both civil and criminal, the truth, when published with good motives and for justifiable ends, shall be a sufficient defense."

This language, plain and explicit as it is, can not be held to have no application to courts, or those by whom they are conducted. The judiciary is elective, and the jurors, although appointed, are, in general, appointed by a board whose members are elected by popular vote. There is, therefore, the same responsibility, in theory, in the judicial department, that exists in the legislative and executive departments to the people, for the diligent and faithful discharge of all duties enjoined on it; and the same necessity exists, for public information, with regard to the conduct and character of those

intrusted to discharge those duties, in order that the elective franchise shall be intelligibly exercised, as obtains in regard to the other departments of the government.

When it is conceded that the guaranty of this clause of the constitution extends to words spoken or published in regard to judicial conduct and character, it would seem necessarily to follow that the defendant has the right to make a defense which can only be properly tried by a jury, and which the judge of a court, especially if he is himself the subject of the publication, is unfitted to try.

Entertaining these views, the judgment of the court below must be reversed, and the respondent discharged.

*Judgment reversed.*