(No. 11568.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* G. W. GILBERT, Plaintiff in Error.

*Opinion filed December 19, 1917.*

1. CONTEMPT—*courts have inherent power to punish for criminal contempts.* Every court of justice, including the county courts, has inherent power, not dependent upon statutory provisions, to punish for criminal contempts, which necessarily include all acts calculated to impede, embarrass or obstruct the court in the due administration of justice, and this power is given to so protect the court that the decision of every case may be obtained from a court unembarrassed by the unlawful conduct of third parties.

2. SAME—*libelous publication is not a contempt of court unless calculated to obstruct justice in suit pending.* A libelous publication concerning a judge cannot be treated as a contempt of court and the publisher be punished therefor unless the court can say, as a matter of law, that the libelous matter is calculated to impede, embarrass or obstruct the course of justice in a suit which is pending, but the judge may bring an action for the libel and is entitled to all the rights of other suitors.

3. SAME—*a party charged with contemptuous libel is protected from arbitrary action in a contempt proceeding.* A party against whom an information has been filed charging him with publishing an alleged contemptuous libel is not concluded by an arbitrary decision of the court that the libel, as a matter of law, was calculated to obstruct the course of justice, since in such a proceeding the State can introduce no evidence to contradict the sworn answer of the defendant except the libelous publication itself, and the decision of the court upon such evidence is subject to review both by the Appellate and Supreme Courts.

4. SAME—*when libelous publication is a contempt of court.* A libelous publication which must necessarily be interpreted as making a positive charge against the judge of a county court that his decision in rejecting ballots in an election contest was not made honestly or in accordance with his understanding of the law must be regarded as a contempt of court where the cause is still pending and the charge is made apparently with an intent to embarrass the court, to cause its future action to be viewed with suspicion and disrespect and to influence the final outcome of the case.

5. SAME—*editor of a newspaper may be guilty of contempt although libelous matter is published without his knowledge.* The editor or publisher of a newspaper is liable for the publication of

libelous matter though inserted without his knowledge or consent, and where such publication amounts to a contempt of court, want of knowledge may influence the degree of punishment but will not exonerate the editor or publisher from responsibility.

6. SAME—*heading is considered part of an article in determining whether publication is libelous and contemptuous.* The heading of an article is a part of it and must be so considered in determining whether or not the publication is libelous and contemptuous, where the party charged is in a position or relation that makes him responsible for its publication.

7. SAME—*disavowal of an intent to commit contempt will not justify publication of matter contemptuous per se.* Where the language of an article charged to be contemptuous is capable of explanation so as to show that it is not contemptuous, and it is so explained, the proceedings for contempt must be discontinued; but where the publication is clearly contemptuous *per se,* a disavowal of an intention to commit a contempt cannot justify the act.

8. PRACTICE—*when an action is pending.* An action is pending the entire time from the beginning of the action until final judgment has been pronounced and entered.

9. SAME—*State has right to petition for rehearing in a criminal case.* Under the rules of the Appellate Court and of the Supreme Court, rehearings may be allowed in all cases on the giving of notice and the filing of a petition in accordance with said rules, and the State has the right to apply for a rehearing in all cases, civil or criminal, without violating the constitutional right of a defendant not to be twice put in jeopardy for the same offense.

10. SAME—*case is not ended in an Appellate Court until rehearing is denied.* Where a petition for rehearing has been filed in the Appellate or Supreme Court in conformity with the rules the case is not at an end in that court, nor is final judgment entered and in force until the rehearing is denied.

11. SAME—*when defendant is not entitled to raise question of double jeopardy.* A defendant is not entitled to raise the question in the Supreme Court that the allowance of a rehearing by the Appellate Court deprived him of his constitutional right not to be placed twice in jeopardy for the same offense, where he did not raise the question when the petition for rehearing was pending in the Appellate Court.

WRIT OF ERROR to the Appellate Court for the Second District;—heard in that court on writ of error to the County Court of Boone county; the Hon. WILLIAM C. DEWOLF, Judge, presiding.

· Alexander J. Strom, and William L. Pierce, for plaintiff in error.

Edward J. Brundage, Attorney General, F. A. Oakley, State's Attorney, and Sumner S. Anderson, (David R. Joslyn, E. H. Waite, and Paul J. Donovan, of counsel,) for defendant in error.

Mr. Justice Duncan delivered the opinion of the court:

· Plaintiff in error, G. W. Gilbert, was found guilty of having committed a contempt of the court in the county court of Boone county and was sentenced to pay a fine of $150 and to imprisonment in the county jail for twenty-four hours. A writ of error to the county court was sued out of the Appellate Court for the Second District to review the judgment and sentence of the county court. That court reversed the judgment of the county court, with an order that plaintiff in error be discharged. Subsequently the Appellate Court granted a rehearing, and on February 10, 1917, affirmed the judgment of the county court, and the record has been brought to this court by writ of error for review.

From the record it appears that an election was held in the town of Belvidere upon the question whether or not that territory should be saloon or anti-saloon territory. It further appears that the election resulted in making the town anti-saloon territory, and that a suit had been brought by several parties in the county court to contest that election. The court had entered an order for the counting of ballots, and thereafter, upon argument, the court ruled that the ballots in four of the precincts were not admissible in evidence and should not be counted. The ballots were counted and admitted in evidence in the third precinct. The county judge called in two other county judges to sit with him and announced that the other sitting judges would act only in an advisory capacity, and that the decision and rulings in the

case would not be the decision and rulings of the three or a majority of the three judges, but would be made solely by himself. The court had previously, on May 20, 1914, entered an order that three commissioners be appointed to assist the court in making a re-count of the ballots and had also appointed two persons to act as clerks in making the re-count, all of said parties assisting in said re-count to be allowed the sum of four dollars per day, to be taxed as costs. The ballots were not opened and re-counted in open session of the court but were removed to the directors' room of the People's Bank, where the re-count was made.

A written information was filed November 27, 1914, by David R. Joslyn, State's attorney, charging plaintiff in error with the publication in the *Belvidere Journal,* a weekly newspaper published in the city of Belvidere, of a certain article alleged to be contemptuous. The said article was published on June 27, 1914, and reads as follows:

*"The Wet and Dry Controversy still in the Melodrama Stage.— Judge DeWolf makes Grand-Stand Play in rejecting the Recount of Ballots as evidence in four of the five Wards in the City.*

"We do not presume that we are competent to pass upon such grave questions as was before Judge DeWolf on last Wednesday afternoon.

"As far as we are concerned there is no material difference whether the final decision is 'wet' or 'dry'.

"It is our right to propound a few questions to a thinking public for their consideration.

"Does anyone think there were any questions involved that required the presence of three judges sitting *en banc?*

"Why did Judge DeWolf not order the count in compliance with the Election law, (sec. 27,) which reads as follows:

"'In all cases of contested elections the parties contesting the same shall have the right to have the said ballots opened, and have all errors of the judges in counting or refusing to count any ballots corrected by the court or body trying such contest, but such ballots shall be opened only in open court, in open session of such body and in the presence of the officer having custody thereof of the ballots.'

"The law is as plain as any man could wish and needs no legal mind to construe it, yet Judge DeWolf ordered men to make this

count, and after it was made, not in open court but in the private
room of the People's Bank, at a cost to the county of $16.00 a day,
refuses to admit the count in evidence in four-fifths of the precincts.

"Why did not Judge DeWolf read all of the decisions cited by
the contestants, one of which is as follows: *West* vs. *Sloane,* 238
Illinois Supreme Court report, page 331.  The Supreme Court held
under the statute the ballots were admissible in evidence in any
event, but their probative force depends upon the care with which
they have been preserved.  This case was cited by the contestants
but not referred to by Judge DeWolf.

"It is inconceivable why Judge DeWolf allowed the ballots cast
in the third precinct to be introduced in evidence when the evidence
showed that Mr. Alexander, as a judge of elections in the third
precinct, placed the sacks containing the ballots in a room in his
home where there were two or three school teachers boarding, any
of which could have tampered with the ballots, and refused to allow
the ballots introduced in evidence of the second precinct on the
ground that Mr. Girch took the ballots to his home election night
and placed them on the table in a room adjoining his, he having
one boarder and his family.

"He ruled that the third precinct could be admitted while those
in the second were rejected, yet he says 'there was no intimation
that any of the ballots were tampered with.'

"In our judgment Judge DeWolf could have admitted all bal-
lots as evidence on their probative force, and, in harmony with
the law, by so doing would have thereby furthered the ends of
justice, which cannot be reached in any other way.

"There is a strong desire of the rank and file to have the elec-
tion gone into to ascertain the true facts, and we feel sure had the
people the power to recall decisions, as they should have, this is
one that would be recalled.

"The other two judges who sat with Judge DeWolf have no
weight with any thinking man, as advisory guests seldom dissent
with their host.

"In our discussion of this case we are simply bringing out, for
the benefit of the public, the questions that present themselves to
any inquiring mind, with the hope that justice may prevail in the
end.  Because we dissent to the opinion of Judge DeWolf does not
prove that we are right, but with these few points called to your
attention we leave the final judgment to the people.

"What we try to do is give the facts, and do not believe that
any honest thinking man can blame us when he takes all things
that surround this case into consideration.

"The question will arise in our mind, why?  The law is manda-
tory that these ballots should have been opened and counted in
open court.

"While we do not criticise Judge DeWolf in making the decision, as no doubt it was his honest conviction that the decision as rendered was in keeping with his ideas of justice, yet we claim the right to differ with him regarding his ideas of justice and right, and we do not believe that his decision was in keeping either with the preponderance of the decision of the Supreme Court or was in harmony with law or public opinion.

"In cases of this kind the people should have the right to the recall of decisions of the county court, as cases of this kind can not be reviewed by a higher court. In cases of this kind a county judge becomes an absolute czar.

"It is conceded that in the third precinct, where the ballots were properly preserved, the wets made a clear gain of fifteen votes. Taking this as a basis, any man can see what the actual majority would have been if the return made by the judge of the election had been correct.

"What we want is a square deal,—simple, old-fashioned justice."

At the time of the publication of the article aforesaid the election contest was still pending in the county court and was not finally disposed of until some two weeks after the publication of the alleged contemptuous article. It appears from affidavits filed by some of the parties and their attorneys interested in the contest, that the decision of the county court that the ballots of four of the precincts were not admissible in evidence or that they would not be considered as evidence affecting the result of the election was the settling of the main proposition upon which they had based their hopes of success in the election contest, and that while they had not made it known to the court nor to the contestees or their attorneys that the decision by the court would finally necessitate a decision against them as to the final result, yet as a matter of fact, shortly after such decision and before the publication of the said article, they had determined among themselves that they would not further prosecute the suit, as they could not hope to show that there were enough illegal votes cast by voters voting for the town to remain anti-saloon territory to change the result of the election, and that they had so informed the plaintiff in error. The affidavits filed on behalf of plaintiff in error do, however, clearly

show that at the time said publication was made the contest of election was still pending in said court and that plaintiff in error knew it was still pending.

Plaintiff in error by his sworn answer denied that he either prepared the head lines of said article or that he authorized anyone else to prepare them, and therein averred that the article, with the headlines, was published without his knowledge or procurement.  He further sets forth in his affidavit that he was reliably and credibly informed before the publishing of said article that the ruling of the court in excluding from the evidence said ballots at said election would amount to a practical discontinuance of the case, and for that reason further stated that said publication was not in reference to any suit or cause then pending.  He admits that he wrote and had published all of said article except the head lines, and stated also that said article was not intended in any manner to reflect upon the honor and integrity of said court or to charge that the law was not fairly administered in said court; that said article was written and published without malice and in good faith, the respondent believing that the matter was proper for publication, and was designed and intended to call attention to a practice believed to be the subject of criticism; that the evil complained of and criticised was the refusal of the court to admit in evidence the ballots cast at said election after they had been placed in the custody of the commissioners appointed by the court to re-canvass and re-count the same; that in so doing said ballots have been considered by the court as competent for what their probative force might be as evidence in determining the result of the election; that respondent could not understand why the judge refused to admit the ballots in evidence and why the judge had apparently so changed his opinion after having made a large amount of expense in appointing the commissioners to assist him in the re-count; that it was because of such apparent change in the opinion and attitude of the court that

281 — 40

respondent called the attention of such matters to the consideration of the public in said article, and that in so doing he was merely expressing his honest views and opinion upon the subject and was not acting in any other sentiment or feeling except to give the true facts as they existed of record; that the publication of the article was not intended as a contempt of said court or as an interference with the due administration of the law in said court. By his affidavit plaintiff in error disclaimed any intention of casting any aspersions upon the character or integrity of the court, or of impeding, injuring or delaying the administration of justice, or of influencing or affecting any subsequent decision or decisions of the case.

It is further set forth in the affidavit that plaintiff in error had a conference with S. J. Jewell, one of the petitioners to contest said election, for the purpose of ascertaining the status of the case and the position of the contestants with reference to the decision rendered by the court rejecting the ballots in evidence; "that as a regular weekly issue of the said newspaper would be published on the Sunday following, and as the decision above mentioned was rendered on Wednesday, this respondent desired to give as nearly as possible the feeling and sentiment of the contestants, so that he might publish the entire proceedings and the position of the contestants with reference to the said contest; that he asked the said Jewell  *   *   *   what the contestants proposed to do in the face of the decision of the court rejecting the said ballots, and said Jewell thereupon informed this respondent in so many words that the case was at an end so far as the petitioners were concerned and that he was going to the court house to ascertain the amount of the costs and pay them up; that the said Jewell informed this respondent that when a judge of that court or any other court was so prejudiced in an action that he would refuse to obey the statute or the decided laws of the State, that he did not desire to further expend his money

in litigating before any such a court, as he believed that
Judge DeWolf was so prejudiced and warped in favor of
the 'dry' side of the contest that he permitted such feeling
and prejudice to sway him against the express letter of the
law and the well considered decisions of the court; and act-
ing upon what this respondent then believed to be absolutely
reliable sources of information, and not actuated in any way
by any feeling of resentment, revenge, hatred or ill-will to-
ward the said trial judge, because this respondent says that
at that time he was not personally acquainted with and had
never met the said trial judge but once or twice to his knowl-
edge, this respondent published said article, believing that
the information that he had obtained with reference to the
status of the case was true and implicitly relied upon the
truth of what he had been informed by those in a position
to know and by those in whom this respondent placed im-
plicit confidence; and this respondent says that he did not
know that there would be anything further done with the
said case, and thought that it had been disposed of by the
said ruling until after the said article had been published.
This respondent, further answering, admits  *   *   *   that
at said time he was the editor and proprietor of the *Bel-
videre Journal,* a weekly newspaper of general circulation
throughout the said county of Boone," and that the said
newspaper was published as charged.

One of the grounds urged by plaintiff in error in the
reply brief for the reversal of the judgment and sentence
of the county court is, that that court is a court of limited
jurisdiction and has no right or power conferred upon it
by statute or by the constitution to punish as for a contempt
any person for the publication of a scurrilous charge or
article in a newspaper, no matter what may be its tendency
or effect upon the court or any officer thereof, or any mat-
ter in litigation before said court.  His argument is that the
county court has no power to punish for any character of
contempt offered to it while sitting as such court if the acts

constituting the alleged contempt were committed outside the presence of the court, but apparently concedes that it does have a right to punish for contempts committed in its presence. That question has been settled adversely to the contention of plaintiff in error by repeated decisions of this court. In *Schmidt* v. *Cooper*, 274 Ill. 243, this court re-announced the doctrine in this State that the power to punish for criminal contempts is inherent in every court of justice, and necessarily includes all acts calculated to impede, embarrass or obstruct the court in the due administration of justice, and that the power is in no way dependent upon statutory provisions. The county court is one of the courts authorized and created by the constitution of 1870, and it. is one of the courts of justice alluded to in said decision as having such inherent power. It is also definitely decided by this court that under our constitution a publication in a newspaper, however libelous, not directly calculated to hinder, obstruct or delay courts in the exercise of their proper functions, cannot be treated and punished summarily by the court so libeled as a contempt of court. (*Storey* v. *People,* 79 Ill. 45.) Such publications amounting only to libels of courts or jurors or other officers of courts will subject the publishers thereof to prosecutions for libel, but in such prosecutions the party so prosecuted is entitled to a trial by jury before a court not interested or concerned in any way as to the result of the suit, and the truth of such publications may be relied on as a defense when published with good motives and for justifiable ends. (Const. art. 2, sec. 4; Hurd's Stat. 1916, chap. 38, sec. 179.) For such libels court officers stand upon the same footing as other individuals, and in their suits for civil damages a jury trial is guaranteed, and it is competent for defendant to establish the truth of the matter so published by a preponderance of the evidence.

The object and purpose of punishing individuals for contempts against courts committed out of their presence, under our law is not, as is apparently assumed by plaintiff in

error, for the purpose of punishing individuals for mere libels or slanders or insults against presiding judges or any officers of the courts. In no case can an editor of a newspaper, or an author of a libelous article published in said newspaper, be punished for a contempt of court on account of the publication of said article unless the court can say, as a matter of law, that such libelous matter is calculated to impede, embarrass or obstruct the due administration of justice. Neither is it true that in a proceeding against a party for publishing an alleged contemptuous article of and concerning a judge, or any officer of the court of which he is judge, such party is altogether at the mercy of such judge. No evidence is admissible against such party to contradict the sworn answer to the information filed against him or to the interrogatories propounded to him wherein and whereby he is given an opportunity to purge himself of such contempt, except the alleged libelous article itself, in case such party admits writing or publishing it. In other words, as some judge has quaintly expressed it in substance, the prisoner in such a case makes and furnishes the key to the jail to which he is consigned, if imprisoned for such a contempt. He cannot be legally condemned for a criminal contempt unless his own evidence condemns him, and his evidence can not be contradicted by other witnesses or other evidence for the State. The question, however, whether or not the article is contemptuous is for the court, and it is not admissible to show by evidence that the publication is true or the motives with which it was made. (*Storey* v. *People, supra.*) The reasons are apparent. No one should be allowed to do in court or out of court anything that would compel a judge, or tend to compel or influence him, to decide a case for or against an individual against his honest convictions, or that would embarrass him in making a decision, whether it be by publishing or threatening to publish some charge against such judge, whether true or false, or by charging him with corrupt motives or corrupt conduct in the court in which

he is presiding. Every person interested in any matter in litigation in any court not only has the right to fair and impartial treatment in such court, but is also entitled to be so dealt with, and to have the court and the officers of the court so dealt with, that he may not have cause to feel or to believe that an unjust decision was compelled or obtained by the unlawful conduct of another. The chief object of our law and our constitution is that all parties may obtain justice when they apply to our courts for the settlement of their controversies, and if they cannot get justice in the courts then it may truly be said that there is no place in this country where they can obtain justice. This is the high ground that makes it so necessary that a court be empowered to punish for indirect criminal contempts.

While the court against which or against whose officers the alleged contemptuous matter is published passes on the question whether or not the published matter is contemptuous,—*i. e.,* calculated to impede, embarrass or obstruct the court in the due administration of justice,—and after considering only evidence furnished by the defendant, yet the decision of the court is not conclusive. A writ of error may be sued out of the Appellate Court to review the judgment of the lower court, and, finally, such a writ may be sued out of the Supreme Court to review the judgment of the Appellate Court, as has been done in the instant case. (*Stuart* v. *People,* 3 Scam. 395; *People* v. *Seymour,* 272 Ill. 295; *Schmidt* v. *Cooper, supra.*) So, in reality, the judge of the lower court is not, in such a case, trying his own case in which he is in any proper sense a party and in which he is the final arbiter. If he consider the case properly he will not consider mere injury or insult offered to himself as a judge, but what offense or injury, if any, is committed against the public by an act calculated to unlawfully interfere with the due administration of justice. If he errs, the defendant has ample opportunity to have the case reviewed by two other courts in no way personally interested or con-

nected with the case. The personal liberty of the defendant cannot be very greatly endangered by such proceedings so governed and so conducted. It is believed that the embarrassment of the trial court necessarily encountered in every case will in the majority of cases cause the trial court to proceed with extraordinary caution and consideration for the defendant, and rather with leniency towards him than with unnecessary severity or oppression.

On the main question whether or not the article in question is contemptuous we entertain no doubt that the holdings of the trial and Appellate Courts are correct. The publication was made while the cause was pending, and it is of such character that it was calculated to embarrass the court and to cause its future action to be viewed with suspicion and disrespect. An action is pending the entire time from the beginning of the action until final judgment has been pronounced and entered up. (30 Cyc. 1364, note 7.) The editor and proprietor or the publisher of a newspaper is liable for the publication of libelous matter though inserted without his knowledge or consent. (*Storey* v. *Wallace,* 60 Ill. 51.) While want of knowledge of such a publication amounting to a contempt of court may influence the degree of the punishment to which the proprietor or managing editor may be liable, yet it does not exonerate him from responsibility. (*People* v. *Wilson,* 64 Ill. 195.) The heading of an article is a part of it and must be so considered in determining whether or not the publication is libelous and contemptuous, where the party charged is in a position or relation that makes him responsible for its publication. (18 Am. & Eng. Ency. of Law, 985; *People* v. *Fuller,* 238 Ill. 116.) When the language of an article charged to be contemptuous is dubious in meaning and capable of explanation and is explained so as to show that it is not contemptuous the proceedings must be discontinued, but where it is offensive and insulting and contemptuous *per se,* a disavowal of an intention to commit a contempt may tend to excuse, but

cannot justify, the act.  *People* v. *Wilson, supra;  O'Flinn* v. *State,* 9 L. R. A. (N. S.) 1119, and note.

It requires little or no discussion to show that the article in question is contemptuous *per se.*  It is set out in full in the statement of the case in the exact form and words as it appeared in the newspaper.  The language in the head lines, "Judge DeWolf makes grand-stand play in rejecting the re-count of the ballots as evidence in four of the five wards in the city," must necessarily be interpreted as making the positive charge against the judge of the court that his decision in rejecting the ballots was not made honestly or in accordance with his understanding of the law.  When the rest of the article is considered along with the head lines they are not susceptible of an other interpretation or explanation.  There is no attempt made by plaintiff in error in his answer to give his exact meaning in the use of the words in the head lines.  In the argument it is stated by his counsel that the words "grand-stand play" are not anywhere defined by lexicographers and must be understood as meaningless.  Those words, however, have a well fixed meaning to the people by common understanding.  The readers of that article were clearly made to understand that the charge against the judge was, that in making his decision he was playing to the multitude about him and simply making such a decision as would be pleasing to the multitude, regardless of the law.  This idea is further borne out by the words in the article, after quoting the simple language of the statute: "The law is as plain as any man could wish and needs no legal mind to construe it, yet Judge DeWolf ordered men to make this count, and after it was made, not in open court but in the private room of the People's Bank, at a cost to the county of $16 a day, refuses to admit the count in evidence in four-fifths of the precincts."  Other paragraphs in the article are equally convincing to show that such interpretation of the article gives the true intent of the plaintiff in error in publishing the article.  The affi-

davit expressly states that it was his desire and intention in publishing the article "to give as nearly as possible the feeling and sentiment of the contestants, so that he might publish the entire proceedings and the position of the contestants with reference to the said contest." He then further proceeds to set out in his article facts and statements of the contestants showing clearly that the feeling and sentiment of the contestants towards the trial judge were, in fact, very hostile; that their position was, in fact, that they had not been given a square deal by the court and were resenting his acts and decision. The whole import of the article is one of resentment upon the part of the author at what is clearly expressed to be an unjust decision made by the court and clearly and intentionally against the law of the case, and the charge is apparently made with intent to have a bearing and influence upon the final outcome of the case. It is also clearly made to appear in the article that a majority of the people in that community were resenting the decision of the judge for the same reason, and it is stated in the article that in such a case the people should have a right to recall such decision, and that the people of that community would recall that decision if they had the power so to do. The article then closes with the declaration, "What we want is a square deal,—simple, old-fashioned justice." The article also discloses that plaintiff in error knew that there was no right of appeal or writ of error from such decision given by the statute, and the court was warranted in concluding that the last appeal was made to him as a judge, there being no other court or body to whom such appeal could effectively be made. As the article was clearly contemptuous *per se,* plaintiff in error could not excuse himself by the declaration or statement under oath that he had no interest in the matter in question and had no feeling against the judge and did not mean to use contemptuous language concerning the court. In other words, he cannot now say that the sentiment and feeling that he expressed

in the article were the feeling and sentiment of other parties and not of himself or that he did not mean what the language of the article clearly expresses.

The contention of plaintiff in error that the reversal of the judgment of the lower court by the Appellate Court is a complete bar to further action of the Appellate Court in the granting of a rehearing and the affirming of the judgment of the lower court, upon the doctrine that he cannot be thus twice put in jeopardy, is not sound. If it be conceded that a criminal contempt is to be considered and dealt with in this particular in the same manner as it would be were it in fact a criminal charge outright, plaintiff in error has not been and is not being twice put in jeopardy, within the meaning of the law and of the constitution. Under the rules of the Appellate Court, and also under the rules of this court, rehearings are given in all cases on the giving of notice thereof within a certain time, upon compliance with other requirements of the said rules. The State has the same right to a rehearing in all cases, civil or criminal. This exact question, so far as we are now advised, has not been heretofore passed on by this court. It is the constant practice of this court, however, to allow petitions for rehearing to the State in such cases whenever the court is convinced that it has made an erroneous decision that entitles the State to a rehearing. The position of plaintiff in error challenges the right of the Appellate Court and of this court to grant rehearings in criminal cases. Other courts have settled this question adversely to his contention. (*State* v. *Jones,* 64 Iowa, 349; *Drake* v. *State,* 29 Tex. App. 265; *Powers* v. *Commonwealth,* 114 Ky. 237.) No good reason or authority has been presented demanding a change in the practice of allowing rehearings to the State as well as to the defendant. The retaining of the control of the judgments and the staying of the mandates of the Appellate and Supreme Courts for the purpose of reviewing their judgments on petitions for rehearing and

the correction of any errors therein at the instance of either the defendant or the State, is necessary to give such courts full and proper consideration on review and to render the proper decision and the proper judgment therein, and does not violate the constitutional right of the defendant that he shall not be twice put in jeopardy for the same offense. It cannot be truly said in such a case that the defendant has been twice tried, or tried a second time after a verdict of not guilty, by a trial court and a jury or by a trial court, which we think should be the test of former jeopardy within the meaning of the constitution. When a case is being reviewed in the Appellate or Supreme Court under rules prescribing that either party may have a rehearing the case is not at an end in that court nor a final judgment entered and in force until the rehearing is denied, when the court has stayed its mandate and retained control of the case for further consideration on rehearing. In this case the rehearing of the case was necessitated by the act of the plaintiff in error in failing to properly abstract the record so as to show positively that the case was pending in the lower court for final decision when the contemptuous article was written and published. The Appellate Court first reversed the cause upon the theory that the case was finally disposed of in the lower court and final judgment entered. Had the Appellate Court not been misled by the arguments filed by plaintiff in error and by his abstract, it clearly appears from the first opinion of the Appellate Court that the judgment of the court would not have been reversed in the first instance. Besides, plaintiff in error did not raise this question of former jeopardy in the Appellate Court when the petition for rehearing was pending. We have not been content to place our decision upon that ground, but, as a matter of fact, under former decisions of this court he is not entitled to raise the point now under consideration in this court.

For the foregoing reasons the judgment of the Appellate Court is affirmed.          *Judgment affirmed.*