Thomas D. GOSS, also known as Thomas
Duggan, Plaintiff,

v.

STATE OF ILLINOIS et al., Defendants.

No. 61 C 1223.

United States District Court
N. D. Illinois, E. D.

March 26, 1962.

Sol R. Friedman, I. S. Friedman and Edwin R. Armstrong, Chicago, Ill., for Thomas D. Goss, also known as Thomas Duggan, plaintiff.

Daniel P. Ward, State's Atty. of Cook County, Chicago, Ill., for State of Illinois, and others, Thomas A. Hett, Asst. State's Atty. of Cook County, Chicago, Ill., of counsel.

PARSONS, District Judge.

Thomas D. Goss, a citizen of the United States, during 1955 appeared regularly five nights a week on a late evening television broadcast from a Chicago station entitled the "Tom Duggan Show". It was a form of conversation-commentary program. It dealt heavily in criticisms and sarcasms, and often included unrestrained attacks on public officials and other people involved in current news stories.

On July 26, 1955, a Chicago citizen filed a complaint for divorce against his wife in Superior Court of Cook County, charging her with cruelty. He also moved for custody of their child, and the testimony given in support of the motion tended to implicate the child's mother in improper conduct with Thomas D. Goss. The custody hearing continued through July 29th, and then was recessed to September 12th, when it was resumed. Goss was called and appeared as a witness on September 12th and 13th, and on September 20, 1955, temporary custody of the child was awarded to its paternal grandparents.

At various times during the child custody proceedings, Goss, in his "Tom Duggan Show", commented on the proceedings, its parties, witnesses and attorneys. His remarks were severe and tended to hold the persons about whom he commented up to public ridicule. Then, on November 1, 1955, some forty-two days after the termination of the temporary custody proceedings, the only proceedings in which Goss was a subject of evidence, the Judge before whom the custody proceedings had been heard caused the institution of contempt proceedings against Goss, and later himself heard and ruled on the rule to show cause.

In the contempt hearing, Goss sought a change of venue and a jury trial. Both of his requests were denied. He admitted the statements attributed to him, admitted knowledge of the pendency of the child-custody proceedings, denied that his purpose in his broadcasts was to influence or intimidate the Judge or the witnesses, and stated that his motive was to defend himself before his television audience against the charge of adultery raised in the child-custody proceedings, which charges were being publicly aired.

The Judge in his decision on the contempt explained that in the course of the contempt hearing Goss did not seek to apologize to him and promise not to similarly conduct himself again, and then found Goss guilty of "criminal indirect contempt." There was a ten-day jail sentence and a $100.00 fine.

The Supreme Court of Illinois on direct review in the contempt case decided that Goss had been entitled upon request to a change of venue, and reversed and remanded the case. At the same time, the Supreme Court reviewed the proceedings below and held that the statements of Goss on television "constituted a clear and present danger to the administration of justice." People of State of Illinois v. Goss, 10 Ill.2d 533, 141 N.E.2d 385. Explaining that the three principal United States Supreme Court decisions on contempt vs. freedom of speech out of which the reasonable tendency rule has been supplanted by the clear and present danger rule, related to intimidation of judges, who are deemed to be able to withstand intimidation, thus accounting for their reversals of state contempt punishment, the Court found that here the intimidation was not of the trial judge but of the parties and their witnesses who have no special degree of fortitude to withstand intimidation, and thus the United States Supreme Court decisions did not apply.

The contempt case against Goss thus remanded returned to the Superior Court, where it was assigned to another Judge, who heard it by stipulation on the prior record. Indicating that he was bound by the Supreme Court's ruling on the merits of the case, he too found Goss guilty of contempt and reassigned the same penalties. On direct appeal again, re-trial was affirmed. Subsequently, certiorari and rehearing were denied by the Supreme Court of the United States. Goss v. People of the State of Illinois, 365 U.S. 881, 81 S.Ct. 1029, 6 L.Ed.2d 192; Id., 366 U.S. 941, 81 S.Ct. 1658, 6 L.Ed. 2d 852 (1961). The mandate of Illinois' Supreme Court having issued, the Sheriff of Cook County now holds the mittimus for the arrest and confinement of Goss.

On July 21, 1961, Thomas D. Goss, as a plaintiff in this Court, filed a complaint under the Federal Declaratory Judgment Act, 28 U.S.C.A. § 2201 et seq. He seeks to invoke jurisdiction under the

power of this Court to redress the deprivations of rights, privileges and immunities of citizens to freedom of speech and press secured by the First Amendment, 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. § 1983, and made applicable to state action through the Fourteenth Amendment to the Constitution. He asks this Court to declare that he will be denied his right to due process of law as well as his right to freedom of speech and press if the mittimus for his arrest held by the State of Illinois is not held void and its enforcement permanently enjoined.

■ The defendants contend this Court is without jurisdiction to act in the matter. I do not agree. The rights and immunities of freedom of speech and press are guaranteed by the Fourteenth Amendment to citizens of the United States against state action. Douglas v. Jeanette, 319 U.S. 157, 162, 63 S.Ct. 877, 87 L.Ed. 1324; Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492; National Association for the Advancement of Colored People v. Gallion, Atty. Gen. of Alabama et al., 368 U.S. 16, 82 S.Ct. 4, 7 L.Ed.2d 85.

■■ Any state judicial decision which violates either due process of law or freedom of speech and press is within the protection of the Fourteenth Amendment. Tribune Review Publishing Co. v. Thomas, D.C., 120 F.Supp. 362, 369; Nesbit v. Riesenman, 298 Pa. 475, 148 A. 695, cert. denied, 281 U.S. 754, 50 S.Ct. 408, 74 L.Ed. 1164; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; and any duty of a sheriff to carry out that decision in any manner which would result in further offense to these rights of a citizen would constitute state action in violation of Federal law, and would yield to the injunctive powers of this Court. Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Douglas v. City of Jeanette, 319 U.S. 141, 63 S.Ct. 877; Cooper v. Hutchinson, 3 Cir., 184 F.2d 119.

■ Defendants contend that plaintiff may not seek relief by way of an action for declaratory judgment in the course of which he requests injunctive relief, but first should submit to the Sheriff for jailing and then come in by way of the Habeas Corpus Act, 28 U.S.C.A. § 2241 et seq. When a person alleges that he has been deprived of constitutional rights under color of state law by the final judgment of the state court, a Federal District Court will take jurisdiction under the Declaratory Judgments Act without awaiting his submission to administrative action of state executives performed pursuant to that judgment. Cooper v. Hutchinson, 3 Cir., 184 F.2d 119, 124; Kristensen v. McGrath, 86 U.S. App.D.C. 48, 179 F.2d 796, 798–800; Tribune Review Publishing Co. v. Thomas, D.C., 120 F.Supp. 362; D.C., 153 F. Supp. 486; 3 Cir., 254 F.2d 883. The Tribune case is particularly in point. In its first decision, 120 F.Supp. 362, the Court held that it had jurisdiction but that it chose not to take jurisdiction until the state court had ruled on the constitutional question.

■■ Defendants contend that plaintiff is attempting to get this Court to re-litigate and review the judicial determination of other courts of competent jurisdiction, and that the Civil Rights Act cannot be employed merely to seek a review or correction of a state court's decision. This contention is in error. Where a constitutional question is raised out of the act of a state officer depriving or seeking to deprive a person of a constitutional right, this Court has original jurisdiction and a primary responsibility, within the historic context of the relationship of Federal Courts to the states. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Railroad Warehouse Commission of Minnesota v. Duluth Street Railway Co., 273 U.S. 625, 47 S. Ct. 489, 71 L.Ed. 807; Gobitis v. Minersville School District, D.C., 21 F.Supp. 581; Mitchell v. Wright, 5 Cir., 154 F.2d 924. To the extent to which state courts may figure in the totality of the state action which becomes the subject matter of a civil rights case, that action will be part of the subject matter of the Fed-

eral case, Westminister School District v. Mendez, 9 Cir., 161 F.2d 774; but the availability of higher state court review, as a matter of propriety and preferred procedure will be respected. Shipman v. Du Pre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877; Great Lakes Dredge and Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407; A. F. of L. v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873.

Defendants contend that plaintiff has been accorded in every manner due process of law. To the degree to which it may become necessary, this contention will be discussed later, since it is possible that a discussion of the freedom of speech issue, the same being the more fundamental freedom, may dispose of the entire matter before the Court.

 Defendants then contend that plaintiff's conduct constituted a clear and present danger to the due administration of justice, and that his right to freedom of speech and press will not serve to protect him from punishment for contempt. They adopt as their argument the opinion of the Illinois Supreme Court in People v. Goss, 10 Ill.2d 533, 141 N.E.2d 385. I concur with the reasoning that the constitutional guarantee of free speech and press is limited by the rule that no person may impede or interfere with the orderly administration of justice. We say the same thing when we invert our conflicting interests and declare that the power of courts to punish contempt is circumscribed by the constitutional guarantee of free speech and press. In each instance the Court must weigh the detriments to one against the benefits to the other. In borderline cases, where it is difficult to say on which side wisdom and constitutional justice should fall, freedom of public comment should be given special weight against a tendency to influence a pending case. The clear and present danger rule gives us guidance in a certain class of cases. The rule is that intemperate language, false charges and unfair criticism must yield to judicial restraint, when in the course of a judicial proceeding they present clearly illumined and immediately present danger imperiling the fair administration of justice in that proceeding. It appears unimpeachably logical that where this situation attains it is incumbent in the interest of the objective of the rule that the Court act forthwith. Of course, where actual obstruction of justice already has been accomplished by offending speech, the purpose of a contempt proceeding would be vindicative and not preventive, and there would be no reason for applying the clear and present danger rule. Time would not be of the essence. In cases involving the clear and present danger rule, there should have been, at the time of the issuance of the rule to show cause, sufficient reason of fear that more serious evil would result to justify immediate action to prevent a continuation of the threatening speech. This appears to be the thinking of the Court in Nye v. United States, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172.

 In cases not involving accomplished obstruction of justice, Illinois, like many other states, has applied, not the clear and present danger rule, but the reasonable tendency to obstruct justice rule. This rule has permitted its courts an easier use of the contempt power in restraint of free speech and press. People v. Gilbert, 281 Ill. 619, 18 N.E. 196; Storey v. People, 79 Ill. 45; People v. Wilson, 64 Ill. 195; People v. Doss, 382 Ill. 307, 46 N.E.2d 984. In People v. Goss, 10 Ill.2d 533, 141 N.E.2d 385, Illinois acknowledges the "clear and present danger" rule.

Whether this older and less exacting rule still being followed is called the reasonable tendency rule, or the inherent tendency rule, or the calculated to impede rule, it does not satisfy the Supreme Court of the United States. Nor does that Court contemplate a different rule to be applied at will by state courts to that it has announced. As stated in Pennekamp v. Florida, 328 U.S. 331, at 335–336, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295:

"When the highest court of a state has reached a determination

upon such an issue, we give most respectful attention to its reasoning and conclusion but its authority is not final. Were it otherwise the constitutional limits of free expression in the Nation would vary with state lines."

 The Supreme Court's interpretation of the clear and present danger rule, by which this Court is here bound, is found in three cases: Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; the Pennekamp case, cited above, and Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546. It is of significance that since the Supreme Court reversed itself in Nye v. United States, 313 U.S. 33, 52, 61 S.Ct. 810, 85 L.Ed. 1172, and cast out the "reasonable tendency rule" followed in Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186, it consistently has reversed every state contempt case for out of court utterances which has come before it. The construction given the "clear and present danger rule" leads one to believe that the bend of the Supreme Court's thinking is that both State and Federal Courts be almost entirely precluded from punishing by contempt all out of court statements whatsoever. Certainly, four severe limitations have been placed on us:

(1) Almost no circumstance will permit the use of contempt to merely protect the Judge from intimidation. Thus Craig v. Harney, 331 U.S. 367, at 376, 67 S.Ct. 1249, at 1255, states:

"But a judge may not hold in contempt one who ventures to publish anything that tends to make him unpopular or to belittle him. * * *"

This means that in each case the nature of the persons to be influenced is important.

(2) The concept of "no comment on pending litigation" under certain circumstances may need to be limited to completed episodes of trial or hearings or proceedings. This is not directly attended in either of these cases, but the thinking of the Court indicates at least the re-evaluation of the traditional language used, if not the advisability of the trial "episode" limitation. It is stated in Bridges v. California, 314 U.S. 252, 268–270, 62 S.Ct. 190, 197:

"An endless series of moratoria on public discussion, even if each were very short, could hardly be dismissed as an insignificant abridgment of freedom of expression.

"(Yet) to assume that each would be short is to overlook the fact that the 'pendency' of a case is frequently a matter of months or even years rather than days or weeks."

(3) Wherever there is a borderline case, it must be resolved in favor of freedom of speech and press. In Pennekamp v. Florida, 328 U.S. 331, at 347, 66 S.Ct. 1029, at 1037, the Court stated:

"In the borderline instances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases."

And (4) pursuit of contempt for utterances creating a clear and present danger should be timely or the immediacy of the peril may be lost, and the case will not be justified unless the obstruction of justice is accomplished. In each of the three leading cases before the Supreme Court, the contempt proceedings was instituted forthwith following the earliest recognition of the threat of the publication. In Bridges and Pennekamp, the trials were interrupted to seek relief from the utterances by contempt proceedings; and in Craig, the condemned statements occurred near the end of the trial, but the rule to show cause was issued before a final order in the hearing was entered. Mr. Justice Jackson, dissenting in Craig v. Harney, 331 U.S. 367, at page 396, 67 S.Ct. 1249, at 1264, explained that the trial judge

" * * * was diverted from the calm consideration of the litigation

before him by what he regarded as a duty to institute contempt proceeding of his own against his tormentors."

Here again, the Supreme Court does not directly attend the point in these cases. It is necessary to reason from the Court's premise and from its approach to the problem in similar cases.

■ It must be remembered that Federal Courts are prohibited by law from punishing by contempt outside publications. This prohibition came as early in our history as 1831. When Federal Judge James H. Peck punished by contempt a newspaper publisher for criticizing his handling of a case, two things happened. First, impeachment proceedings were instituted in Congress against the Judge. When they failed, Congress then enacted what is now Section 401 of Title 18, United States Code, which permits punishment for criminal contempt by Federal Courts only with relation to conduct so near to the immediate presence of the Court as to endanger its due administration of justice.

The Supreme Court in interpreting this phase "so near thereunto as to obstruct the administration of justice," eliminated outside publications from Federal contempt power, and disposed of the argument that this power rests upon the common law handed down from England by explaining that in this one particular area, the common law of England was countermanded by the First Amendment to our Constitution. Accordingly, and even as for the states, the English common law permitting contempt control over outside publications is in abrogation of the spirit of the First Amendment.

For this reason, permitting contempt to be used to restrain outside publications impinging upon the tranquility of state courts bears, not the approval, but the mere tolerance of the Supreme Court. This tolerance is measured only by the narrow difference between the effect of the First Amendment directly upon Federal Courts, and its effect upon state courts when read in through the Fourteenth Amendment.

A review of the cases involving Federal summary contempt reveals a severe adherence to the principle that the rule to show cause must be brought immediately, or may not be brought at all unless the obstruction was accomplished. Under this circumstance, the proper approach would be punishment through prosecution under appropriate criminal statutes, by virtue of which trial by jury would be available. (See Section 1503, Title 18 U.S.C.) This seems to be the thinking of the Supreme Court in Nye v. United States, 313 U.S. 33, 61 S.Ct. 810. See also Bridges v. California, 314 U.S. 252, 266–268, 62 S.Ct. 190.

Certainly every case must be reviewed with the understanding that the "clear and present danger rule" is not a dogma. Our considerations must include the setting in which the statements were made, the nature of the statements, and the party or parties to be influenced by them.

■ Let us turn now to the case before this Court. With whom are we dealing? What is the setting? Here, a television personality used his programs, the character of which was sarcastic criticism of people, to air his personal resentment for being named as co-respondent in a divorce-child-custody hearing. While the hearing was in progress, he denounced the parties, their witnesses, the attorneys and the proceedings. He stated that he had promised the defendant in the case that he would do what he could to stop it. The weapon at his disposal was his daily television appearance before the public.

In the course of his comments, he called one witness a "twenty-four year old professional sneak and liar." He called the plaintiff's father a "known associate of hoodlums," who had on other occasions not been believed when he testified for hoodlums. He called the plaintiff a jobless husband who preferred to remain that way. He accused the plaintiff of

having broken into the defendant's home and beat her and threatened her with hoodlum revenge. He accused the plaintiff's attorney with having offered him a bribe to leave his name out of the case, if he, Goss, would lay off hoodlums in his broadcasts. He condemned the testimony of one witness as being contradictory. He called the witness a snook and liar beyond his testimony. He referred to the plaintiff's family as being admitted associates of hoodlums of the most vicious type. He commented about his own testifying in the case, saying that what he testified to had been told on his broadcasts, but that he had not been permitted to testify fully.

This was certainly a sordid series of unrestrained attacks on people—too sordid to have been sent over the waves to our television world. It was an abuse of one of our great media of communication for the private personal purposes of an individual who, while furnishing entertainment to the public, has at his disposal and uses an instrument impressed with a public interest—an instrument not similarly available to those he criticized. However, the use of communication media for the personal interests of the editorialist does not, as defendants assert, serve as a controlling factor in measuring the case by the clear and present danger rule. In the Bridges case, the offender was the chief officer of the union that was involved in the litigation. He had a personal interest in the outcome of the litigation, and threatened to invoke a strike if the case should not come out to his satisfaction.

Defendants observe that the utterances were directed at the plaintiff in the domestic relations proceedings and his witnesses, and not at the trial judge. This is true and the trial judge was not influenced by them. This serves to remove from our consideration the admonitions of the Supreme Court in its three leading cases: That Judges may not retaliate to vindictive criticism by summary suppression of free speech. But this does not therefore establish that the clear and present danger rule

would apply here. At the same time, I cannot bring myself to agree with Baltimore Radio Show v. Maryland, 193 Md. 300, 67 A.2d 497, where the argument is rejected that jurors need more protection from potentially prejudiced comment than Judges. There is no question in my mind that our system of justice depends upon full protection of the jurors from intimidation and coercion. They are lay people of no special training in law. Their relationship to the system is short lived, and their concern for personal matters extending beyond their court experience make them easy victims of pressures.

Generally, witnesses are in no better position than jurors, as long as they are disinterested witnesses. Attacks on them through the press can discourage their willingness to make full disclosure. But litigants in civil cases, their attorneys, and their interested and trial participating witnesses stand on a different footing. Their strength is derived from their predisposed interest in the outcome of their litigation. They have a right to a fair and impartial trial. They cannot complain as long as no outside influences unduly impinge upon their Judge, their jury and their disinterested witnesses. Our judicial system can offer them no more.

At whom had Goss directed his utterances in the instant case? One was the plaintiff in the local court proceedings. He was a litigant. One was his father, who was a substantially interested witness. One was the attorney for this plaintiff. And one was the plaintiff's private investigator. These are not persons who as participants in this trial may be considered so vulnerable to the language that was used here as to justify the assumption that Goss created a clear and present danger to the administration of justice. They would have been angered by his utterances, but there is no reason to infer that they would have been intimidated by them. They would have been insulted by the utterances, but it cannot be said that these circumstances would have a tendency to dissuade them

from pursuing their objectives in the case. Before the contempt proceedings were brought, they sued Goss for libel. Need they add to this remedy the shield of the Court created to protect only its administration of justice? Assuming that some apprehensions they experienced because of these utterances reflected into the tranquility of their case, the situation would be borderline, and not one out of which there was a clear and present danger that justice would be obstructed.

One further consideration stands in the way of my readily finding this case one within the "clear and present danger rule" as explained by the Supreme Court. This was not a contempt proceedings in which it was found that the intimidation was accomplished. The evidence is to the contrary. Accordingly, it was incumbent upon the trial court to issue his rule to show cause at a time when the threat was imminent. The imminence of the threat was at its fullest in the first several broadcasts included in the bill of particulars of the rule, and of this the trial judge was then well aware. Had he brought his rule then, further utterances would not have been forthcoming. The purpose of the proceedings would have been accomplished. The respondent would not have been lulled into a sense of security in his utterances. The evidence shows, on the other hand, that the rule was delayed not merely until there was a rest period in the proceedings, but for forty-two days beyond the order which terminated the temporary child-custody hearing. Although this seems a mere technicality, it appears to me a substantial consideration and would serve further to take the case out of the operation of the "clear and present danger rule".

In view of the foregoing, the plaintiff herein will prevail, and the orders of this Court will be entered herein to the extent that they not be inconsistent with this opinion. The mittimus in the hands of the Sheriff is hereby declared null and void.