(No. 33930.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS D. GOSS, Plaintiff in Error.

*Opinion filed March 20, 1957.*

534

Sol R. Friedman & I. S. Friedman, both of Chicago, for plaintiff in error.

John Gutknecht, State's Attorney, of Chicago, (Gordon B. Nash, Charles D. Snewind, William Sylvester White, and Francis X. Riley, of counsel,) for the People.

Per Curiam: Thomas D. Goss, also known as Thomas Duggan and herein referred to as plaintiff in error, brings this writ of error to reverse an order of the superior court of Cook County adjudging him guilty of contempt of court, and sentencing him to ten days in the county jail and a fine of $100. Our jurisdiction is based upon the claim that the order deprived him of the rights of free speech guaranteed by the first amendment to the Federal constitution, as made applicable to the States by the fourteenth amendment.

During the year 1955 the plaintiff in error appeared regularly on an evening television program broadcast five nights a week from a Chicago station. This program was watched, according to the testimony of plaintiff in error, by some 200,000 persons within the Chicago area. The charge of contempt was based on certain remarks made by plaintiff in error in the course of these broadcasts during July and August, 1955, with reference to a divorce action then being tried in the superior court.

On July 26, 1955, Carl Champagne filed a complaint for divorce against his wife, Shirley, in the superior court of Cook County, charging her with cruelty. On the same date he made a motion that he be granted custody of their child, and a hearing on this motion was held before Judge Daniel A. Covelli. The hearing commenced on July 26 and lasted until July 29, at which time the court entered an order granting temporary custody to Carl Champagne's parents, and continuing the case until September 12 because the testimony on the part of the plaintiff had not been concluded. On the latter date the hearing was resumed and it continued until September 20, on which date another order was entered which also granted temporary custody to the paternal grandparents. The complaint for divorce was still pending and undisposed of at this date.

On July 28 one Robert Risberg, a private detective, testified on behalf of Carl Champagne that on June 3 Mrs. Champagne had spent the hours of from 2:30 A.M. until 6:00 A.M. in the apartment of plaintiff in error, and that on June 11 she had spent the hours of from 2:00 A.M. to 5:45 A.M. there. On July 29 the complaint was amended to charge Mrs. Champagne with having committed adultery with John Doe on the dates mentioned above. Cross-examination of Risberg began on July 28 and was completed on the following day. In a broadcast on the evening of July 28, plaintiff in error stated of Risberg with respect to his testimony in the case that he was a "professional

sneak and liar." In subsequent broadcasts plaintiff in error again referred to Risberg in these terms.

On July 28 there also testified on behalf of Carl Champagne, his father, Dr. Carl Champagne, and his uncle, Anthony Champagne. On his broadcast of August 1 plaintiff in error referred to Carl Champagne and his relatives as a family "with court-admitted hoodlum connections," and referred to Dr. Carl Champagne as "a known associate of hoodlums." He further stated that Anthony Champagne had offered to keep the name of plaintiff in error out of the case if he would "lay off the hoodlums" in his broadcasts, but that plaintiff in error had on the contrary promised Mrs. Champagne to do everything in his power "to prevent the legal kidnaping of her child." The plaintiff in error also made statements denying that he had committed adultery with Mrs. Champagne and expressing sympathy for her.

In the course of the same broadcast plaintiff in error also stated that Carl Champagne had filed an action against him for alienation of affections, and in a broadcast of August 30, he stated that an action for slander had been filed against him by Risberg.

The present contempt proceedings were commenced on November 1, 1955, with the issuance of a rule to show cause by Judge Covelli. Plaintiff in error filed two petitions which raised various objections to the rule. He filed no answer, however, and he admitted having made the statements attributed to him with knowledge of the pendency of the divorce action. Plaintiff in error disclaimed any intent to influence or intimidate the judge or the witnesses and stated that his motive was to defend himself before his television public against the charges of adultery which were being made at the trial and which were being reported in a Chicago newspaper in a manner which plaintiff in error considered unfair.

At the hearing on the rule to show cause, plaintiff in

error attempted to show that his statements were true. As to his charge that the Champagnes had "court-admitted hoodlum connections," it appears from the record that Anthony Champagne, after having testified that he knew certain named individuals, denied any knowledge of them as criminals. Plaintiff in error sought to introduce evidence that these individuals did in fact have criminal records. This evidence was excluded by the court. It also appears that in his testimony Anthony Champagne had denied having made any offer to plaintiff in error to keep the latter's name out of the divorce proceedings. The court excluded evidence offered by plaintiff in error to show that such an offer had in fact been made.

In its order adjudging plaintiff in error guilty the court stated: "The public utterances and characterizations by the said Thomas Duggan Goss of the plaintiff and witnesses called in his behalf were false, completely foreign to the evidence presented, with a positive tendency and designedly calculated to bring odium upon the testimony of the witnesses produced by the plaintiff and to inspire distrust in their testimony; engender a public atmosphere of hostility incompatible with judicial proceedings; create in the public mind by false, incompetent and prejudicial hearsay made without the safeguards of an oath or right of cross examination the belief that the plaintiff and those associated with him were of base character and that the plaintiff should not prevail in his cause; to create in the minds of witnesses fear and apprehension of being held to public scorn and ridicule and to exculpate himself from a charge amply sustained by the evidence."

The general principles governing contempt by publication have long been settled in this State. Under our decisions a publication is contemptuous only if it is "calculated to impede, embarrass or obstruct the due administration of justice." (*People* v. *Gilbert,* 281 Ill. 619, 628.) The publication of scandalous or libelous matter concerning a court

or a judge is not, without more, contemptuous. The publication must tend to affect the outcome of a pending case. (*Storey* v. *People*, 79 Ill. 45; *People* v. *Gilbert*, 281 Ill. 619, 628-629.) On the other hand, it is not necessary to show that an interference with the administration of justice has actually occurred, nor is it a defense for the contemnor to disclaim any subjective intention of producing that result. *People* v. *Wilson*, 64 Ill. 195; *People* v. *Gilbert*, 281 Ill. 619; *People* v. *Doss*, 382 Ill. 307, 314.

Judged by these standards there can be little question but that the statements made by plaintiff in error were contemptuous and, indeed, plaintiff in error does not seriously argue to the contrary. His remarks impugned the motives of Carl Champagne and his family, enlisted sympathy for himself and Mrs. Champagne, and reflected upon the character and veracity of the witnesses who testified for Mr. Champagne in the custody hearing. In the light of the statement by plaintiff in error that he would do everything in his power to prevent the "legal kidnaping" of the Champagnes' child, it is clear that he hoped to influence the outcome of these proceedings, in which he, though not formally a party, was personally involved. But whether the statements made on the broadcasts would deter witnesses from testifying in favor of Mr. Champagne, or incite them to do so, in either event they would exert an outside influence upon the proceedings.

At the time of his statements the custody hearing had not yet been completed, and as the record shows it was probable that these same witnesses, or others, might subsequently be called to the stand. Indeed, the record shows that the testimony of one of these witnesses, Risberg, had not been completed before the time when the plaintiff in error first disparaged him. Furthermore, the divorce action proper, in which a jury trial may be had under our statutes, (Ill. Rev. Stat. 1955, chap. 40, par. 8,) was also pending at this time. The same witnesses attacked by plaintiff in

error could be expected to be called by Mr. Champagne to testify at that stage of the proceeding. Under the circumstances, the remarks by plaintiff in error constituted an interference with the administration of justice. See *State* v. *Howell*, 80 Conn. 668; *In re Simons*, 248 Mich. 297; *In re Lindsley*, 75 Cal. App. 122.

The plaintiff in error contends, however, that his conviction violates his rights under the first amendment to the Federal constitution. In support of this contention he cites the decisions of the United States Supreme Court in *Bridges* v. *California*, 314 U.S. 252, *Pennekamp* v. *Florida*, 328 U.S. 331, and *Craig* v. *Harney*, 331 U.S. 367.

The first of these decisions involved two cases. In one of these, after the conviction of two members of a labor union for an assault on nonunion men, but before the time had arrived for sentencing, a newspaper published an editorial strongly denouncing the defendants and stating that the judge would be making a serious mistake if he granted them probation. The newspaper and its publisher were found guilty of contempt and the conviction was affirmed by the State Supreme Court. The United States Supreme Court reversed. The starting point of the decision was that in contempt cases, as in other areas, the validity of a restriction on speech must be justified under the "clear and present danger" test, which the court described as "a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." (314 U.S. at 263.) So far as the question of substantive evil was concerned, the court conceded that a State was entitled to protect its judicial processes from interferences on the part of intimidating publications. But the court held that there was no likelihood in this case of the publication's producing such an effect, since the attitude of the newspaper on labor matters was so well known that even in advance of the

editorial the judge would have expected adverse criticism if he should grant probation.

In the companion case, Bridges had been convicted of contempt for having published a statement that enforcement of a decision adverse to a union of which he was an officer would cause the union to strike. This statement was made while a motion for new trial was pending in the case. The Supreme Court based its reversal on the proposition that the "realities of the stiuation" were such that even before the statement by Bridges the trial judge must have been aware that a strike might result from his decision. We do not think that these decisions control the present case. There is no basis in the record for assuming that the persons who were the subjects of derogatory comments by plaintiff in error already had reason to anticipate that such comments would be made, either because of his known attitude toward them prior to the filing of the divorce action or because of any objective facts in the situation.

Nor do we think the *Pennekamp case* applicable. There the publication charged that in dismissing certain indictments a judge had been actuated by improper deference to the defendants, and that, in general, he displayed partiality toward the defendants in criminal cases. Although the defendants' trial was still pending, the criticism was only of action already taken, and it was on this ground that the Supreme Court reversed the conviction.

As we have already pointed out, the contemptuous remarks of the plaintiff in error were not limited to criticism of past action. The future outcome of the custody hearing and of the divorce action depended heavily upon the testimony to be offered by the persons whom he attacked, and he had publicly announced his intention to influence that outcome.

In *Craig* v. *Harney* the conviction was for an editorial which unfairly criticized the action of a judge in directing

a verdict in a case in which a motion for new trial was pending at the time of publication. As in the *Bridges case,* the Supreme Court based its decision upon the proposition that the judge had already been made aware from other sources that his decision would be unpopular. The decision was also rested upon a presumption that judges are not readily susceptible to intimidation. (See 331 U.S. at 376; cf. *Pennekamp* v. *Florida,* 328 U.S. 331, 349; *Bridges* v. *California,* 314 U.S. 252, 273.) In the present case, however, our concern is not merely with the effect of the statements in question upon the trial judge, for they were directed to parties and witnesses, to whom there is no reason to attribute a special degree of fortitude.

Plaintiff in error also relies on *Baltimore Radio Show* v. *Maryland,* 193 Md. 300, 67 A.2d 497, *certiorari* denied, 338 U.S. 912. That case involved news broadcasts relating to the murder of a child, which had aroused great public concern in the city of Baltimore. The broadcasts, which were based on information received from the police, revealed that a negro named James had been arrested, that he had confessed to the crime, that he had recently been released after serving a sentence for an earlier criminal assault on another child, and that he had admitted to police of having recently made an attack upon a white woman in the same area of the city in which the present murder had occurred. These statements were apparently true. After waiving trial by jury James was found guilty and sentenced to death, and his conviction was affirmed by the Court of Appeals. No motion was made at the trial to secure a change of venue and no complaint was made of the prejudicial character of the broadcasts. James's confession was admitted in evidence over objection. In subsequent proceedings, the Court of Appeals reversed a judgment finding the persons responsible for the broadcasts guilty of contempt. The court held that since James's confession was admitted at his trial, since evidence of his

previous offenses was admitted without objection, and since under Maryland law jurors would not necessarily have been disqualified for having formed an opinion based upon the broadcasts, their occurrence caused no prejudicial error in James's trial, and, moreover, would not have furnished grounds for a reversal even if James had been tried before a jury. Since this was so, the court reasoned, then the broadcasts must be regarded as protected under the clear-and-present-danger test. The court explicitly confined its opinion to publications involving only factual reports, reserving judgment as to statements which are "inflammatory, false, or designed to intimidate." (193 Md. at 331, 67 A.2d at 511.) Quite apart from this limitation, however, we are unable to accept the theory that the contemptuous character of a publication concerning a pending proceeding depends upon the effect of the publication in the proceeding itself.

In reviewing a criminal case, the publication is largely weighed in terms of its actual impact upon the jury. (But cf. *People* v. *Hryciuk,* 5 Ill.2d 176.) Furthermore, the effect of the publication is not considered in isolation. The issue on review is principally the defendant's guilt, and if upon consideration of the entire record a court is not convinced that actual prejudice occurred, reversal will not be ordered merely to correct error. Reversal, moreover, while benefiting the defendant, has no disciplinary effect upon the offending publication.

Apart from the specific holdings of the decisions relied on, however, plaintiff in error points out that in laying down its standards of "clear and present danger" in the *Bridges case* the Supreme Court expressly rejected as a test the "reasonable tendency" of a publication to interfere with the administration of justice. (See *Bridges* v. *California,* 314 U.S. 252, 272-3.) And it is argued that a finding that a publication was "calculated" to so interfere is equally insufficient. The choice of words, of course, is

not important. We recognize, however, that these decisions of the Supreme Court must be taken as announcing generally that the standards hitherto employed in some States are not rigorous enough to satisfy the demands of the first amendment. We do not conceive that the court intended to go so far as to require proof of an actual interference with the judicial process, as plaintiff in error suggests. (Cf. *Sinclair* v. *United States,* 279 U.S. 749, 762-4.) Nor do we find any rejection of the view that "the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." (*Patterson* v. *Colorado,* 205 U.S. 454, 462; cf. *Bridges* v. *California,* 314 U.S. 252, 271.) What is required, we think, is that the character of the publication and the circumstances in which it was made must be scrutinized with special caution and concern because of the potential threat to free speech which the contempt power obviously holds. Comment on pending cases, even if it is unfair and inaccurate, is not to be adjudged contemptuous unless it constitutes an "imminent peril" to the administration of justice. (*Craig* v. *Harney,* 331 U.S. 367, 376.) The social interest in the integrity and competence of the judicial process requires that courts and judges should not be shielded from wholesome exposure to public view, and if this interest is to be well served, then some latitude must be allowed for inaccurate and intemperate comment. But where comment is systematically designed to serve the contrary aim of thwarting the judicial process, then, as the Supreme Court has acknowledged, such comment is not constitutionally protected. See *Craig* v. *Harney,* 331 U.S. 367, 375.

The comments involved here were delivered by one who had a personal and professional interest in the decision in a pending action, and they were admittedly designed to affect that decision by a sustained and systematic attempt to prevent or impugn unfavorable testimony by vilifying

any witness who should offer such testimony as well as the party in whose behalf the witness appeared.

On cross-examination plaintiff in error testified: "I knew that the case was pending from July 26th to September 20, 1955. All the remarks made by me were made with full knowledge that there was a case pending before this Court in regard to the subject matter of my comments. I knew that the witnesses I named, Risberg, Carl Champagne, Dr. Carl Champagne and Anthony Champagne, were witnesses, for plaintiff."

Plaintiff in error's bold defiance can best be gathered from his broadcast of July 29, 1955, which he admittedly published: "I was all set to make any number of comments on a certain child custody hearing that is going on over in the Superior Court in the county building which has brought my name into the Chicago American, if not into the other papers but I have some excellent legal advice that I better stop commenting on the testimony as it goes along I am,—I am going to go into the pokey. It seems to be there is some precedent in the Illinois courts as established in the Supreme Court of Illinois that regardless of how truthful and informative comments might be that you might make on a trial that is in progress that has no bearing on the case, you can go into the pokey. There is a number of excellent cases proving the point and so my lawyer has asked me to refrain from getting him in trouble as well as myself."

"When a case is finished courts are subject to the same criticism as other people; but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied." So wrote Mr. Justice Holmes in *Patterson* v. *State of Colorado*, 205 U.S. 454 at 463. As Justice Holmes has said many times in describing his theory of our system of justice "That the conclusions to be reached in a case will be induced only by evidence and argument in open

court, and not by any outside influence, whether a private talk or public print." In this day and age of radio and television, to hold otherwise would be a dangerous precedent. We are in accord with much of the rationale expressed by Justice Frankfurter while dissenting in the *Harney case*: "It cannot be repeated too often that the freedom of the press so indispensable to our democratic society presupposes an independent judiciary which will, when occasion demands, protect that freedom. To help achieve such independent judiciary and to protect its members in their independence, the states of the union from the very beginning and throughout our history have provided for prompt suppression and punishment of interference with the impartial exercise of the judicial process in an active litigation."

The rights of the people in the first and fourteenth amendments are vital and sacred. So are the rights of the people to a court determination uninfluenced by anything but the law and evidence presented in an orderly fashion by competent counsel. We have before us infractions that were repeated, bold and defiant, which had for their purpose an interference with an actually pending judicial determination. We hold therefore that the statements of the plaintiff in error constituted a clear and present danger to the administration of justice.

Of much less importance are the other assignments of error. Plaintiff in error argues that this proceeding is a criminal one and must be prosecuted by the proper constitutional officers. The People are not concerned in contempt actions in the sense that such actions are in violation of the peace and dignity of society. As was said in *People* v. *Jilovsky*, 334 Ill. 536, "Contempts are not crimes within the meaning of the statute defining misdemeanors."

Nor was the court in error in the appointment of an *amicus curiae* to make an investigation and conduct the hearing. This procedure was recognized as a proper one

in *Anderson* v. *Macek,* 350 Ill. 135; *People* v. *McDonnell,* 377 Ill. 568; *People* v. *Howarth,* 415 Ill. 499, 502. Also without merit is plaintiff in error's contention that these proceedings did not begin and conclude in a specific form as required by section 33 of article VI of the constitution of the State of Illinois which reads as follows: "All process shall run: *In the name of the People of the State of Illinois;* and all prosecutions shall be carried on: *In the name and by the authority of the People of the State of Illinois;* and conclude: *Against the peace and dignity of the same."* In *Anderson* v. *Macek,* 350 Ill. 135, this court held that "Contempts are not crimes" and are not subject to the constitutional provision cited above, stating at page 138: "Furthermore, in *Lester* v. *People,* 150 Ill. 408, we said: 'The holding in respect of whether the contempt proceeding should be entitled and prosecuted as an independent proceeding in the name of the people or carried on as a part of the civil proceeding to which it is incident is not uniform. The question has ordinarily been treated, as it necessarily is, of comparatively little importance.' In *People* v. *Jilovsky,* 334 Ill. 536, we said that contempts are not crimes within the meaning of the statute defining misdemeanors, and that section 33 of article VI of the constitution, which provides that 'all prosecutions shall be carried on: In the name and by the authority of the People of the State of Illinois; and conclude: Against the peace and dignity of the same,' has no application to a proceeding to punish for contempt. There was no warrant for holding the judgment a nullity on the ground suggested." Complaint is also made by the plaintiff in error that his rights were prejudiced in that he was denied a jury trial in these proceedings. It is to be noted that plaintiff in error, in open court, admitted that he had made the statements over television that he is alleged to have made in the order to show cause and consequently there was no factual issue to be tried by a jury. *(People* v. *Burkert,* 7 Ill.2d 506.) **In**

*People ex rel. Martin* v. *Panchire,* 311 Ill. 622, we said at 628: "No court has ever held that a party is entitled to a trial by jury in a proceeding for contempt in the absence of a statute so providing."

The last contention is more serious. Plaintiff in error filed a verified petition that recited, among many other things, that the trial judge was prejudiced against him. The petition sought to have the matter transferred to the executive committee of the court for reassignment to another judge, or in the alternative, to obtain a change of venue. This petition was denied by the trial judge, apparently because plaintiff in error had sought to get certain unnamed politicians to prevail upon him to transfer the matter to another judge for hearing, and he did not wish to appear to be yielding to that sort of pressure.

From the record it appears that both the custody proceeding and this proceeding had bizarre aspects that made it unusually difficult for the trial judge to perform his task. But we are of the opinion that the judge's appraisal of the circumstances of this particular case should not have overridden the statutory provisions for a change of venue. The statute (Ill. Rev. Stat. 1955, chap. 146, par. 21,) provides for a change of venue upon the filing of an affidavit of prejudice. The petition filed on behalf of the plaintiff in error, while it contained many extraneous matters, was nevertheless sufficient to bring the statute into play, and the prayer of the petition for reassignment of the case, or for a change of venue, should have been granted. Because it was not, the judgment must be reversed and the cause remanded, with directions for further proceedings consistent herewith.

*Reversed and remanded, with directions.*