THIRD DIVISION
April 2, 2008

No. 1-06-3026


| | | |
|---|---|---|
| MARY CARR D'AGOSTINO and MARIO D'AGOSTINO, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs and Counterdefendants-Appellees, | ) ) | |
| v. | ) ) | |
| MICHAEL W. LYNCH, | ) ) | |
| Defendant and Counterplaintiff and Third-Party Plaintiff and Contemnor-Appellant, | ) ) ) | |
| (Michigan Avenue Partners, LLC, and Michigan Avenue Partners, Inc., | ) ) ) | No. 98 CH 11007 |
| Defendants and Counterplaintiffs and Third-Party Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| Dominic Forte, | ) ) | Honorable Paddy McNamara, |
| Third-Party Defendant). | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

Defendant, counterplaintiff, third-party plaintiff, and contemnor Michael W. Lynch

(Lynch) appeals on an interlocutory basis pursuant to Supreme Court Rule 304(b)(5) (210 Ill. 2d

R. 304(b)(5)) from the order of the circuit court of Cook County holding him in direct criminal

contempt and sentencing him to 60 days' imprisonment. The court held Lynch in contempt after

he filed a motion for substitution of judge for cause in which he alleged that Judge Alexander

White could not be impartial to his case because Judge White had been bribed by plaintiffs and counterdefendants Mary Carr D'Agostino and Mario D'Agostino, and their counsel, Michael Braun, all of whom Lynch alleged were members of an Italian mafia family. On appeal, Lynch contends that: (1) the court improperly convicted him of direct criminal contempt because there was no evidence that he intentionally embarrassed, obstructed, or hindered the court in the administration of justice; and (2) the contempt finding violates his first amendment right to freedom of speech. For the following reasons, we affirm.

The following facts and procedural history are relevant to this appeal. Plaintiffs Mario and Mary D'Agostino commenced the present action seeking to enforce three promissory notes against defendants Lynch and his real estate corporations, Michigan Avenue Partners, LLC, and Michigan Avenue Partners, Inc.[1] The notes memorialized three loans for hundreds of thousands of dollars that the D'Agostinos made to defendants in 1997.

Defendants filed counterclaims against the D'Agostinos and a third-party claim against Lynch's former business partner and Mario's cousin, Dominic Forte.[2] In the counterclaims, defendants alleged that the promissory notes were actually part of a broader oral funding agreement, under which the D'Agostinos were to lend Lynch substantially more money for use in several projects. Lynch claimed that the D'Agostinos breached this funding agreement, and sought damages for the breach. In the third-party claim, defendants sued Forte for breach of

---

[1]Michigan Avenue Partners, LLC, and Michigan Avenue Partners, Inc., are not parties to this appeal.

[2]Forte is not a party to this appeal.

fiduciary duty.

The D'Agostinos subsequently filed a motion for summary judgment on defendants' counterclaims, alleging, *inter alia*, that there was no agreement to lend defendants money other than what had been memorialized in the promissory notes. The court granted the D'Agostinos' motion, and we affirmed. D'Agostino v. Lynch, No. 1-03-2786 (2005) (unpublished order under Supreme Court Rule 23).

Forte filed a motion to dismiss defendants' third-party complaint alleging, *inter alia*, that it failed to satisfy Illinois's fact-pleading standard because it did not state specifically what Forte had done to breach his fiduciary duty. The circuit court granted that motion, and, once again, we affirmed. D'Agostino v. Lynch, No. 1-03-2786 (2005) (unpublished order under Supreme Court Rule 23).

On August 14, 2003, the circuit court entered judgment in favor of the D'Agostinos for the amount due under the promissory notes, $1,805,651. The D'Agostinos then began to pursue enforcement of the judgment in the circuit court. The D'Agostinos initiated citation proceedings against Lynch in July 2004. This process continued for roughly a year, during the course of which the D'Agostinos were only able to collect $211,143.65.

In February 2005, the D'Agostinos filed a motion to compel Lynch to turn over certain proceeds from the refinancing of his personal residence. Therein, the D'Agostinos claimed that Lynch had sent these proceeds to his attorneys for disbursement to various parties, including his wife, in violation of the citation proceedings. The matter was continued for hearing until August 18, 2005.

However, on August 17, 2005, Lynch filed a personal bankruptcy petition, which had the effect of staying all of the D'Agostinos' efforts to collect their judgment. According to materials filed by Lynch, he voluntarily dismissed his bankruptcy petition in March 2006.

On August 10, 2006, the circuit court commenced a hearing on the D'Agostinos' still-pending request for a turnover order. However, Lynch, who was appearing *pro se* at that point, informed Judge Alexander White, who was presiding over the citation proceedings, that he would be filing a motion for substitution of judge.

Shortly thereafter, Lynch filed a *pro se* "verified motion for judicial admission or denial by Judge Alexander P. White regarding knowledge of and/or participation in alleged criminal acts within and across state lines by judges in the circuit court of Cook County, Illinois, and request for self-disqualification *instanter*." Therein, Lynch alleged that "a criminal enterprise has infiltrated the judicial system in the United States." More specifically, Lynch alleged that Mario D'Agostino and his attorney, Michael Braun, were members of organized crime who bribed several judges, including Judge White, as well as United States Bankruptcy Court Judge Eugene R. Wedoff, who presided over a personal bankruptcy proceeding filed by Lynch, and Cook County Circuit Court Judge Barbara Disko, who had entered judgment in favor of the D'Agostinos in these proceedings. Lynch claimed that these judges "exploit[ed] litigants for their own financial gain," but did not explain specifically how they did so. Accordingly, Lynch claimed that Judge White could not preside over this case because his doing so would deny Lynch his rights to "adequate, complete, effective, fair, full, meaningful and timely access to the court." Lynch further asserted that "any reasonable person knowing the facts of this case would

4

seriously question Judge White's impartiality (as well as his fitness to be on the bench)." Lynch added that he had sent "binders of material evidence" supporting these allegations to criminal and civil authorities, as well as the media.

In support of his motion, Lynch attached his own affidavit averring the truth of his allegations. He also attached two affidavits from Sidney J. Perceful, who averred that he overheard attorneys discussing how to include more assets in Lynch's bankruptcy estate by including Lynch's personal residence in the liquidation.

Lynch also attached to his motion an article from a publication called Business Wire. The article reported that Lynch had recently joined the board of the Illinois Family Court Accountability Advocates (the IFCAA), a nonprofit agency whose goal is "to eradicate social dysfunction through education and activism." Among other things, the IFCAA seeks to combat "judicial corruption – fraud, extortion, coercion under duress – in the Cook County Circuit Court Domestic Relations Division." The article went on to state that Lynch and his family were "also the apparent victims of alleged judicial retaliation for standing up to the alleged judicial corruption in bankruptcy court." The article further stated that "material evidence" of this corruption had been turned over to the authorities.

Next, Lynch attached a printout from the Arizona Corporation Commission's Public Access System. The printout indicated that an Alexander and Esther M. White of Apache Junction, Arizona, were officers and directors of a limited liability corporation called Five Whites, LLC.

The last item Lynch attached to his motion was the transcript of the August 10, 2006,

court proceedings before Judge White. At the outset of the hearing, Braun explained that the day before the request for turnover was to be ruled on, Lynch filed a personal bankruptcy petition. Now that the bankruptcy was over, Braun requested that the court rule on the request for turnover. It was while the parties were arguing the D'Agostinos' requests for turnover that Lynch informed Judge White he would be filing a motion for substitution of judge. Lynch explained that he had evidence that contradicted Judge White's economic interest disclosure and established that Judge White was accepting bribes and funneling the money through Five Whites, LLC. Lynch added that he had given this information to the FBI.

Sometime after Lynch filed his motion, at a hearing on October 4, 2006, Lynch brought his motion to the attention of the court. Judge White then told Lynch that the allegations in his motion were "very, very disturbing," and "libelous." Lynch asserted that he had material evidence and witnesses to substantiate his allegations. Judge White categorically denied any wrongdoing and asserted that Lynch's allegations were false. Attorney Braun added that Lynch has "abused the court system from here to Kansas," and reminded the court that it had the inherent power to hold Lynch in direct criminal contempt for filing such documents and for making frivolous allegations. The court concluded that it would continue the matter.

Thereafter, Lynch filed a second motion captioned a "motion for self-disqualification" of Judge White. This motion also referenced section 2-1001 of the Code of Civil Procedure (735 ILCS 5/2-1001 (West 2006)) and requested a substitution of judge for cause as an alternative to "self-disqualification." In the motion, Lynch made substantially the same allegations against Judge White and attached much of the same supporting material. However, this time, Lynch also

appended documents evidencing the creation of three trusts in Arizona. The first was the "Anchor Trust," which was created by Cynthia L. Capps. The second was the "Omega Trust," into which Kenneth L. Felder and Debra S. Felder conveyed certain real property located in Phoenix, Arizona, to be held in trust for the benefit of a lender. The third was the "ERW Trust," into which Ellen A. Williams and Richard E. Williams conveyed certain real property located in Maricopa County, Arizona. Lynch also attached the transcript of the October 4, 2006, hearing.

The D'Agostinos filed a response to Lynch's motions which included a request for sanctions and contempt. Therein, they explained that they were trying to enforce the $1,805,651 judgment against Lynch and had various turnover requests and a petition for contempt pertaining to the turnover pending against Lynch. The D'Agostinos further explained that Lynch had filed numerous frivolous complaints and motions in the courts, in which he accused numerous state and federal judges in Chicago of being involved in a massive criminal conspiracy. These lawsuits were generally dismissed as frivolous. The D'Agostinos attached documents pertaining to one of these suits to their response. The D'Agostinos also referenced another case in which the United States District Court found Lynch to have committed forgery and perjury after someone sued him to enforce a guaranty. REP MCR Realty, L.L.C. v. Lynch, 200 F. App'x 592 (7th Cir. 2006).

Regarding Lynch's motion for the substitution of Judge White, the D'Agostinos urged the court to find that Lynch's "defamatory and unsubstantiated" allegations constituted a direct attack on the dignity and authority of the court. Thus, the D'Agostinos maintained that Lynch's actions constituted direct criminal contempt of court, which the court should punish with a fine

and/or incarceration. They also requested sanctions.

The matter was then transferred to Judge McNamara, who conducted the hearing on Lynch's motion on October 13, 2006. Prior to the commencement of the hearing, Lynch again requested that the proceedings be conducted *in camera*. Lynch asserted that if the "very disturbing and troubling" facts of the organized crime scheme adherent in the courts were fully disclosed, Lynch and others may be harmed by the D'Agostinos, whom Lynch maintained were members of "*La Cosa Nostra.*" Lynch further stated that if the hearing were continued, and protection granted to his witnesses, he would show who the members of the "crime family" were and explain how they operated. The court denied these requests, finding that to hold an *in camera* hearing would only hurt innocent people by denying them knowledge of the proceedings. The court also added that Lynch's motion should be dealt with expeditiously so that the proceedings could be concluded.

After being placed under oath, Lynch testified that the bribery scheme in place in the courts today is "smarter" and more difficult to trace than in the past times of "Greylord." Now, judges use trusts as "vehicles" to hide their bribery funds.

Lynch believed that certain individuals in control of a company that competed with a company owned by Lynch were trying to force him into bankruptcy. He explained that these individuals were from a family of Italian ancestry and were members of a crime family that operated out of Arizona. The crime family had "infiltrated" the Illinois court system by bribing certain state and federal judges.

Dr. Sheila Mannix of the IFCAA assisted Lynch in bringing charges and filing complaints

against the corrupt judges. Although Mannix did not provide Lynch with any information regarding Judge White, she produced direct evidence regarding several other judges' involvement in the bribery scheme.

Regarding Judge White, Lynch asserted that documentation filed with his motion established that Judge White was an owner and director of Five Whites, LLC. When Lynch confronted Judge White about Five Whites, LLC, Judge White was "visibly shaken," and responded in a retaliatory manner. Nevertheless, Judge White did not deny involvement in Five Whites, LLC. Lynch thus maintained that the D'Agostinos and the mob were using Judge White to obtain a "corrupt judgment" against him.

On cross-examination, Lynch explained that an informant whose identity could not be revealed because he was a member of the Arizona crime family, whom Lynch would only identify as "Informant X," told Lynch that Braun and Mario D'Agostino had bribed Judge White. Informant X also confirmed that the Alexander White who was listed an owner and director of Five Whites, LLC, is the same person as Judge Alexander White. However, Lynch refused to disclose specifically what materials he was shown to support these allegations.

On questioning by the court, Lynch admitted that the only evidence of wrongdoing by Judge White he had presented was that Judge White owned a trust in Arizona that was not revealed on his financial disclosure form. The court then inquired whether there was any evidence that Judge White was the Alexander White who owned this trust, other than the hearsay from Informant X. Lynch responded that he did have other evidence, but he could not disclose it because it would place certain people's lives in jeopardy. Lynch stated that he did have direct

evidence of Judge Wedoff's ownership of the ERW Trust because Judge Wedoff had signed that trust's documentation in the name "Robert Williams." Lynch also stated he had witnesses who would testify to how the bribe transfers were made and where the bank accounts were located, but those witnesses would only testify *in camera*. Before concluding the questioning, the court warned Lynch that he bore the burden to establish why Judge White was biased, adding that Lynch had not adduced any such evidence thus far.

Next, Lynch presented the testimony of Dr. Sheila Mannix of the IFCAA. Mannix testified that she has a Ph.D. in clinical psychology and neuroscience. Several years ago, while Mannix was going through divorce proceedings, she discovered the racketeering practice which has taken hold of the court system in Chicago. She explained that in those proceedings, she was falsely accused of being severely mentally ill. As a result, Mannix was deprived of over a million dollars and custody of her children.

Then, Mannix resolved to expose the corruption in the court system. Lynch met Mannix through Informant X and another man. Informant X helped them to understand that the corruption in the court system was actually the work of organized crime. Mannix explained that judges succumb to the mob because of the money that they make in bribes. Judges also seek to drain the assets of litigants for their own personal gain. Informant X also informed Mannix and Lynch how the crime scheme operated using a system of codes and identity theft. However, Mannix was unable to explain the code because she did not fully understand it yet.

When asked whether she had any evidence that Judge White was engaging in illegal activity, Mannix responded that she was "not at liberty to say" because she did not want to

threaten the lives of certain individuals. At this point, the court observed that Mannix had offered no evidence regarding the allegations against Judge White and asked her to step down. The court again warned Lynch that he bore the burden to substantiate his allegations and asked him if he had any further evidence to present. Lynch responded that he did not.

At the conclusion of the hearing, the court found Lynch in direct criminal contempt and sentenced him to 60 days' imprisonment. In so holding, the court explained that Lynch's motions and presentation disrupted and disrespected the court. The court further observed that Lynch had presented no evidence whatsoever to support the allegations Lynch made against Judge White and characterized Lynch's allegations as "wild fabrication." The court also explained that Lynch could not make serious public allegations against individuals and then say that he would only present evidence to support them in secret.

The court also filed a written order memorializing its findings. Therein, the court added that Lynch's allegations held the state and federal courts in Illinois up to ridicule and served to lessen respect for the system. Lynch was then taken into custody immediately, with no bond issuing.

On October 17, 2006, through newly retained counsel, Lynch filed a motion to reconsider the contempt finding. The court denied the motion, explaining that it found Lynch's actions to have been far more disruptive than those of someone who simply shouts an expletive at a judge because his accusations were defamatory and scurrilous.

On October 24, 2006, different counsel for Lynch requested a stay of the contempt order pending Lynch's appeal. Lynch argued that he had a reasonable chance of success on appeal

because the trial court had based its contempt finding on matters outside the record, namely Lynch's history of filing such motions. The court denied the motion and pointed out that Lynch and the D'Agostinos had made these matters a part of the record.

The same day, Lynch filed a notice of appeal pursuant to Supreme Court Rule 304(b)(5) (210 Ill. 2d R. 304(b)(5)). Lynch also requested that this court stay the contempt order. On October 26, 2006, we granted Lynch's request, stayed the contempt until further order of this court, and ordered that Lynch be immediately released from custody.

On appeal, Lynch first contends that the circuit court improperly found him to be in direct criminal contempt because there was no evidence that he intentionally embarrassed, obstructed, or hindered the court in the administration of justice. Rather, Lynch maintains that he was found to be in contempt simply because he made inflammatory assertions in his *pro se* motion for substitution of judge.

All courts have the inherent power to punish contempt in order to maintain their authority. People v. Simac, 161 Ill. 2d 297, 305, 641 N.E.2d 416, 420 (1994). Criminal contempt is " "conduct which is calculated to embarrass, hinder or obstruct a court in its administration of justice or derogate from its authority or dignity, thereby bringing the administration of law into disrepute." " Simac, 161 Ill. 2d at 305, 641 N.E.2d at 420, quoting People v. L.A.S., 111 Ill. 2d 539, 543, 490 N.E.2d 1271, 1273 (1986), quoting People v. Javaras, 51 Ill. 2d 276, 299, 281 N.E.2d 670, 671 (1972). The contemnor's conduct must be willful; however, contemptuous intent may be inferred from the surrounding circumstances and the character of the conduct.

Simac, 161 Ill. 2d at 307, 641 N.E.2d at 421. A finding of criminal contempt is intended to punish the wrongdoer and vindicate the dignity and authority of the court. Simac, 161 Ill. 2d at 305-06, 641 N.E.2d at 420.

Criminal contempt is said to be "direct" when it occurs in the presence of the judge, making all of the elements of the offense matters within the judge's own personal observation. Simac, 161 Ill. 2d at 306, 641 N.E.2d at 420. Opinions, conclusions, presumptions, and inferences cannot be considered. Simac, 161 Ill. 2d at 306, 641 N.E.2d at 420. However, conduct occurring outside the immediate presence of the judge but within an integral part of the court, such as the filing of documents with the clerk of the court, can also form the basis of a direct criminal contempt finding. People v. Minor, 281 Ill. App. 3d 568, 573, 667 N.E.2d 538, 541 (1996). Because all of the elements of direct criminal contempt occur before the court, direct criminal contempt may be summarily found and punished. Simac, 161 Ill. 2d at 306, 641 N.E.2d at 420. When reviewing a finding of direct criminal contempt, this court considers whether there was sufficient evidence to support the finding and whether the trial court considered any facts outside of the court's personal knowledge. Simac, 161 Ill. 2d at 306, 641 N.E.2d at 420.

This court has previously found that false documents filed by a *pro se* litigant accusing judges of serious misconduct can be grounds for a finding of direct criminal contempt. Minor, 281 Ill. App. 3d at 574-75, 667 N.E.2d at 542-43. In Minor, the defendant filed a litany of *pro se* pleadings and motions accusing his trial court judge of, among other things, being a racist and a member of the Klu Klux Klan, and of having been paid off to sentence the defendant to three

13

years' imprisonment. Minor, 281 Ill. App. 3d at 569-71, 667 N.E.2d at 539-40. This court found that the defendant's accusations that the trial judge was racist and a member of the Klu Klux Klan, alone, were enough to support a finding of direct criminal contempt because they were "clearly calculated to derogate from the court's dignity, to embarrass the court, and to bring the administration of law into disrepute." Minor, 281 Ill. App. 3d at 575, 667 N.E.2d at 543. See also People v. Baxter, 50 Ill. 2d 286, 278 N.E.2d 777 (1972) (holding that summary finding of direct criminal contempt and one-year sentence were proper where the defendant filed a *pro se* petition for substitution of judge alleging that the trial judge was part of a criminal conspiracy to find him guilty).

Here, Lynch sought substitution of Judge White for cause, claiming that Judge White could not be impartial because he had accepted bribes from the crime family. Lynch was given the opportunity to substantiate his allegations at the hearing on his motion for substitution of judge and was repeatedly warned that he bore the burden to substantiate his allegations. Lynch should have also been aware that the D'Agostinos had repeatedly urged the court to hold him in direct criminal contempt for making false accusations.

Nevertheless, Lynch refused to present any direct evidence of wrongdoing by Judge White publicly, claiming that to do so would place people at risk of being murdered by the crime family. The only evidence Lynch did present consisted of his own testimony and the testimony of Dr. Sheila Mannix. However, Mannix did not give any testimony regarding Judge White, and when asked whether she could, she responded that she could not. The only testimony that Lynch gave to substantiate his accusations against Judge White consisted of hearsay. Specifically,

Lynch testified that an individual to whom he would only refer as "Informant X" had told him that Judge White was receiving bribes through an Arizona limited liability corporation called Five Whites, LLC. Lynch also presented a printout from the Web site of the Arizona Corporation Commission's Public Access System, which indicated that an Alexander and Esther M. White of Apache Junction, Arizona, were officers and directors of Five Whites, LLC.

Judge McNamara repeatedly reminded Lynch, during his testimony and during Mannix's testimony, that he needed to support his allegations and warned him that the evidence he was presenting did not support his allegations. Ultimately, Judge McNamara found that Lynch had failed to adduce any evidence to support his allegations and characterized Lynch's motion as "wild fabrication" designed to hold the court up to ridicule.

We find that all of the above conduct, including Lynch's filings and what occurred before Judge McNamara at the hearing on Lynch's motions, was calculated to disrupt court proceedings and bring the administration of law into disrepute. See, e.g., Minor, 281 Ill. App. 3d at 575, 667 N.E.2d at 543. First, Lynch's actions had the effect of harassing the court and the litigants appearing before it, and of obstructing the D'Agostinos in their effort to collect their judgment against Lynch. As the transcript of the August 10, 2006, hearing, which Lynch attached to his motion for substitution of judge, discloses, the D'Agostinos had repeatedly sought turnover from Lynch. Their first request for turnover was postponed when Lynch filed a bankruptcy petition the day before the court was to conduct a hearing on their request. When the proceedings reconvened, and the D'Agostinos were once again arguing their request for turnover, Lynch announced that he would be filing a motion for substitution of judge. Lynch's conduct in

15

requesting a substitution of judge for cause based on such far-flung allegations at this point in the proceedings may only be viewed as gamesmanship calculated to further delay payment of the $1.8 million judgment against him. Thus, Lynch's conduct has obstructed the court's administration of justice.

Second, Lynch made unsubstantiated allegations of criminal misconduct against Judge White, the D'Agostinos, and their counsel. Lynch was given an opportunity to substantiate his allegations against Judge White at the hearing on his motion for substitution of judge, but he refused to do so. Lynch also failed to present any evidence to show how the D'Agostinos and Braun bribed Judge White or how they were connected to the mob. The court ultimately found Lynch's allegations to be false. As the circuit court found, Lynch's unsubstantiated accusations may only be viewed as an attempt to embarrass the court and derogate from its dignity.

Further, we do not believe that this is merely a case of "judicial thin skin," in which a judge is reacting to derogatory remarks directed at her. Cf. Minor, 281 Ill. App. 3d at 575-76, 667 N.E.2d at 543 (Wolfson, J., dissenting). Lynch's allegations were directed at Judge White and not Judge McNamara, who heard Lynch's motion for substitution of judge. We therefore find that the circuit court's finding of direct criminal contempt was supported by sufficient evidence.

Lynch also contends that the circuit court's finding of contempt violates his first amendment right to freedom of speech. We disagree.

The public interest in the integrity and competence of the judicial process requires that courts and judges not be shielded from "wholesome exposure." People v. Goss, 10 Ill. 2d 533,

544, 141 N.E.2d 385, 390 (1957). To that end, the United States Supreme Court has declared that freedom of speech and freedom of the press should not be impaired through the exercise of a court's contempt power unless there is " 'no doubt that the utterances in question are a serious and imminent threat to the administration of justice.' " People v. Hathaway, 27 Ill. 2d 615, 618, 190 N.E.2d 332, 334 (1963), quoting Craig v. Harney, 331 U.S. 367, 373, 91 L. Ed. 1546, 1551, 67 S. Ct. 1249, 1253 (1947). Thus, "the first amendment forbids the punishment by contempt for comment on pending cases in the absence of a showing that the utterances created a 'clear and present danger' to the administration of justice." Hathaway, 27 Ill. 2d at 618, 190 N.E.2d at 334. We further note that although the so-called "clear and present danger" test was developed in cases dealing with out-of-court conduct by the press, it applies equally to cases dealing with in-court conduct by individuals. See, e.g., Eaton v. City of Tulsa, 415 U.S. 697, 698, 39 L. Ed. 2d 693, 695, 94 S. Ct. 1228, 1229 (1974) (considering whether a finding of direct criminal contempt against a individual who referred to his alleged assailant as "chicken-shit" in his testimony violated the first amendment).

Comments that are systematically designed to thwart the judicial process constitute a "clear and present danger" to the administration of justice. See Goss, 10 Ill. 2d at 544, 141 N.E.2d at 390. Accordingly, the Illinois Supreme Court has found repeated comments made on a television talk show accusing a party to a court proceeding of being a member of the mob and of being from a "family 'with court-admitted hoodlum connections,' " which were intended to interfere with the court proceeding, were not protected exercises of free speech and were amenable to contempt. Goss, 10 Ill. 2d at 537, 141 N.E.2d at 391.

Although no Illinois cases have considered whether motions or comments made in court accusing judges of being corrupt would constitute a "clear and present danger" to the administration of justice, the Indiana Court of Appeals has considered this specific issue in Skolnick v. State, 180 Ind. App. 253, 388 N.E.2d 1156 (1979). Therein, Skolnick, an attorney, was called to testify as a witness and during his testimony, he accused the trial judge of being corrupt and to have breached judicial ethics. Skolnick, 180 Ind. App. At 259-60, 288 N.E.2d at1161-62. Skolnick further stated that he was the head of a citizens group that had been investigating corrupt judges for years and accused the judge of questioning him in order to discredit him in his efforts to "clean up the court." Skolnick, 180 Ind. App. At 259-60, 288 N.E.2d at1161-62. In discussing the "clear and present danger" test, the Indiana Court of Appeals observed that " '[s]o long as critics [of court] confine their criticism to facts and base them upon the decisions of the court, they commit no contempt no matter how severe the criticism may be; but when they pass beyond that line and charge that judicial conduct was influenced by improper, corrupt, or selfish motives, or that such conduct was affected by political prejudice or interest, the tendency is to poison the foundation of justice and create distrust, and destroy the confidence of the people in their courts.' " Skolnick, 180 Ind. App. at 267, 388 N.E.2d at 1166, quoting Ray v. State, 186 Ind. 396, 404, 114 N.E. 866, 869 (1917). The court went on to hold that the first amendment cannot be invoked to shield those who make accusations of judicial corruption from contempt charges because such conduct crosses the boundary between protected judicial criticism and conduct posing a serious and imminent threat to the administration of justice. Skolnick, 180 Ind. App. at 267-68, 388 N.E.2d at 1166.

18

We find this rationale to be particularly true where, as here, the accusations against the judiciary are unsubstantiated and have been found to be false. As we explained above, Lynch's allegations of judicial misconduct were wholly unsupported by evidence and were calculated to interfere with the judicial proceedings. See, e.g., Goss, 10 Ill. 2d at 546, 141 N.E.2d at 391. Significantly, Lynch's actions served to obstruct the administration of justice by hindering the D'Agostinos in their efforts to collect their judgment against Lynch. As such, Lynch's conduct was far more egregious than the conduct at issue in Skolnick. We also observe that Lynch has not claimed that his conduct was political expression or opinion. We therefore find that Lynch's unsubstantiated accusations against Judge White constituted a "clear and present danger" to the court's administration of justice. Therefore, his motions and his presentations in support thereof were most certainly not constitutionally protected exercises of free speech.

For these reasons, we affirm the order of the circuit court of Cook County finding Lynch to be in direct criminal contempt and sentencing him to 60 days' imprisonment. The stay of the circuit court's contempt order, which was entered by this court on October 26, 2006, shall continue pending the filing of a petition for rehearing. If no petition for rehearing is filed, the stay will be automatically dissolved upon the expiration of 21 days from the date of the filing of this opinion. If a rehearing petition is filed, the stay will continue pending the disposition of the petition for rehearing.

Affirmed.

QUINN, P.J., and GREIMAN, J., concur.

**MARY CARR D'AGOSTINO and
MARIO D'AGOSTINO,**

        **Plaintiffs and Counterdefendants-Appellees,**

    **v.**

**MICHAEL W. LYNCH,**

        **Defendant and Counterplaintiff and
        Third-Party Plaintiff and Contemnor-Appellant,**

**(Michigan Avenue Partners, LLC, and Michigan
Avenue Partners, Inc.,**

        **Defendants and Counterplaintiffs and
        Third-Party Plaintiffs,**

    **v.**

**Dominic Forte,**

        **Third-Party Defendant).**

---

**No. 1-06-3026**

**Appellate Court of Illinois
First District, Third Division**

**Filed: April 2, 2008**

---

**PRESIDING JUSTICE THEIS delivered the opinion of the court.**

**Quinn, P.J., and Greiman, J., concur.**

---

**Appeal from the Circuit Court of Cook County
Honorable Paddy McNamara, Judge Presiding**

---

**For CONTEMNOR-APPELLANT**

Thomas Anthony Durkin
Durkin & Roberts
53 West Jackson Blvd.
Suite 615
Chicago, IL 60604

**For COUNTER-DEFENDANTS-APPELLEES**

Michael A. Braun
Lee M. Weisz
33 North Dearborn St.
Suite 500
Chicago, IL 60602